954 F.2d 91
 60 USLW 2478, 19 Media L. Rep. 2043
 CABLE TELEVISION ASSOCIATION OF NEW YORK, INC., Plaintiff-Appellant,
v.
William B. FINNERAN; Theodore E. Mulford; Barbara T.
Rochman; John A. Passidomo; Michael E. Russell,
Individually and as members of the New York State Commission
on Cable Television, and the New York State Commission on
Cable Television, Defendants-Appellees.
 No. 384, Docket 91-7539.
 United States Court of Appeals,
Second Circuit.
 Argued Oct. 24, 1991.
Decided Jan. 16, 1992.
 
 R. Bruce Beckner, Charles S. Walsh, Stuart F. Feldstein, Jay B. Bryan, Fleischman and Walsh, P.C., Washington, D.C., for plaintiff-appellant.
 Victor Paladino, Asst. Atty. Gen., Robert Abrams, Atty. Gen., Peter H. Schiff, Deputy Sol. Gen., Peter G. Crary, Asst. Atty. Gen. of State of N.Y., Albany, N.Y., for defendants-appellees.
 Brenda L. Fox, Michael S. Schooler and Loretta P. Polk, Washington, D.C., for amicus curiae, Nat. Cable Television Ass'n, Inc.
 Before MESKILL, WINTER and WALKER, Circuit Judges.
 WALKER, Circuit Judge:
 
 
 1
 This case presents a challenge to New York's authority to regulate rates charged by cable television companies to customers wishing to downgrade to a less expensive level of cable service. The plaintiff, the Cable Television Association of New York (CTANY), asserts that Congress preempted state authority to regulate downgrade charges in the Cable Communications Policy Act of 1984, 47 U.S.C. § 521 et seq. [the Cable Act]. The District Court disagreed and granted New York summary judgment. We now affirm.
 
 
 2
 * Cable television is a system of wires that carries video programming from a central source to the homes of subscribers. In order for a subscriber to receive cable television, the cable company must physically install a wire and a "cable box" in the subscriber's home. The cable box has two functions. First, it acts as a tuner for the television set, allowing the viewer to select the full range of channels. If the subscriber has a "cable ready" television set, this feature is unnecessary. Second, the cable box serves as a descrambler. The signals for premium channels (typically those carrying first run, or close to first run, movies) are encrypted by the cable company to prevent unauthorized viewing. If the customer subscribes to the premium channels, the cable box will descramble the signals. If the customer does not subscribe to the premium channels, the cable company can disable the descrambling feature. Depending on the technology of the particular cable system, this can be accomplished by installing a trap in the wire outside the subscriber's house, by removing the descrambling chip from the cable box, or by sending a signal from the cable system's central computer to the descrambling chip in the subscriber's box instructing the chip not to descramble the premium channels.
 
 
 3
 Subscribers cannot purchase cable services on a channel by channel basis. Instead, cable companies offer tiers of cable service. The lowest tier, economy service, usually consists of local stations, distant broadcast channels like WTBS, WGN, and WOR, and a few public, educational, and government access channels, like CSPAN. The second tier, standard service, includes all the channels in the economy tier, plus some non-broadcast programming networks, like ESPN or CNN. The highest tier, premium service, includes all the channels in the standard tier (and thus all the channels in the economy tier) as well as one or more premium channels, like Showtime or Home Box Office. Each tier includes all the channels in all the lower tiers. Thus, a downgrade to a lower tier results in the disconnection of certain channels, but the addition of none.
 
 
 4
 Cable companies recoup the costs of providing cable services by imposing a fee for installing the wire and descrambler and by charging a monthly rate keyed to the service tier chosen by the subscriber. Since cable companies make the most money when subscribers select premium service, the companies frequently attempt to entice new customers into signing up for premium channels by offering to waive installation charges for the premium subscriber.
 
 
 5
 In addition, in order to keep subscribers in a high tier once they sign up, and in order to defray the cost of disconnecting particular channels, many cable companies impose a substantial charge on customers wishing to downgrade to a lower tier of cable service. These fees range from $40-$100. Since the savings from dropping to a lower level of service is usually around $10 a month, the downgrade fee can remove much of the incentive to switch to a lower level of service.
 
 
 6
 The actual cost to the cable company of implementing the downgrade depends on the technology of the particular cable company. At a maximum, in those systems where a visit to the subscriber's home is required, (that is, those systems where the only way to disable the descrambler is to remove the chip or install a trap in the line) the actual cost of downgrades is between $50 and $75. In technologically advanced systems where no home visit is required, (that is, where the cable company can instruct the descrambling chip from the company's central computer) the actual cost of a downgrade is minimal.
 
 
 7
 In response to customer complaints about downgrade charges, the New York State Commission on Cable Television [the State] adopted regulations limiting the ability of cable companies to impose such charges. See 9 NYCRR §§ 590.61 & 590.63 (1990). The regulations define a downgrade charge as "a charge imposed upon a subscriber for implementing a request for a change in service to a less expensive tier than the tier currently subscribed to." § 590.61(h). While not prohibiting downgrade charges entirely, the regulations limit the charge to the company's actual cost, § 590.63(f)(2), and require that the charge may only be imposed where the customer has been given adequate notice, § 590.63(f)(1), and where the customer is downgrading from a service which the customer has not maintained for the last six months. § 590.63(f)(3). In short, the regulation restricts the use of downgrade charges to the prevention of "churning"--where a customer signs up for a premium channel in order to watch a particular program and then seeks to downgrade to a cheaper service tier shortly thereafter.
 
 
 8
 The State enacted these rules in final form on December 3, 1990, and ordered the cable companies to comply by May 2, 1991. On December 26, 1990, CTANY filed suit in the District Court for the Northern District of New York, seeking a declaration that the downgrade regulation was pre-empted by the Cable Communications Act of 1984, which forbids state regulation of "rates for the provision of cable services." CTANY also sought an injunction barring the state from enforcing the regulation.
 
 
 9
 On April 19, 1991, the district court, ruling from the bench, rejected CTANY's argument. The court reasoned that a downgrade to a lower tier amounted to the removal of cable services, not their provision, since the customer after a downgrade had fewer channels than before, and no new channels. Accordingly, the court found that the pre-emption provision of the Cable Act did not apply and granted summary judgment to New York. This appeal followed.
 
 II
 
 10
 Before turning to the merits of the case, we must determine whether the district court had jurisdiction to hear CTANY's challenge in the first instance. Although neither side has raised the issue, the parties may not confer subject matter jurisdiction on the court by consent. Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 702, 102 S.Ct. 2099, 2104, 72 L.Ed.2d 492 (1982). Instead, we must consider the question sua sponte whenever there is an indication that jurisdiction is lacking. Bender v. Williamsport Area School Dist., 475 U.S. 534, 541, 106 S.Ct. 1326, 1331, 89 L.Ed.2d 501 (1986); Hughes v. Patrolmen's Benevolent Assoc., 850 F.2d 876, 881 (2d Cir.), cert. denied, 488 U.S. 967, 109 S.Ct. 495, 102 L.Ed.2d 532 (1988).
 
 
 11
 CTANY is seeking declaratory and injunctive relief from the state ban on downgrade charges on the ground that the Cable Act pre-empts the state regulation. In evaluating the jurisdictional basis for this action, we first note that the Declaratory Judgment Act, 28 U.S.C. § 2201, does not expand the jurisdiction of the federal courts. Skelly Oil Co. v. Phillips Petroleum Co., 339 U.S. 667, 671, 70 S.Ct. 876, 878, 94 L.Ed. 1194 (1950). Accordingly, we must evaluate this declaratory judgment action under traditional jurisdictional doctrines.
 
 
 12
 It is well established that to invoke federal question jurisdiction, a federal issue must appear on the face of a well pleaded complaint. Merrell Dow Pharmaceuticals, Inc. v. Thompson, 478 U.S. 804, 808, 106 S.Ct. 3229, 3232, 92 L.Ed.2d 650 (1986); Franchise Tax Bd. v. Construction Laborers Vacation Trust, 463 U.S. 1, 9-10, 103 S.Ct. 2841, 2846-47, 77 L.Ed.2d 420 (1983). A complaint that merely anticipates that the defense will raise a federal issue does not create federal jurisdiction. Id. at 10, 103 S.Ct. at 2846. Even where, as here, the federal defense (pre-emption) is asserted affirmatively in a declaratory judgment action, if the underlying coercive lawsuit that the declaratory judgment action seeks to block (here a suit by New York to enforce its rate regulation) would not present a federal issue, then the declaratory judgment procedure cannot furnish the federal courts with jurisdiction. Id. at 16, 103 S.Ct. at 2849. Accordingly, if CTANY were seeking only declaratory relief, we would be required to determine whether a suit by New York to enforce its cable regulation would present sufficient federal issues to create federal subject matter jurisdiction. See Nashoba Communications v. Town of Danvers, 893 F.2d 435, 438 (1st Cir.1990) (no substantial federal issue in declaratory judgment action brought by cable company asserting that Cable Act pre-empts municipality's enforcement of rate freeze mandated by franchising agreement).
 
 
 13
 However, CTANY also seeks an injunction barring enforcement of the state regulation. In Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983), decided the same day as Franchise Tax Board, the Supreme Court found no jurisdictional defect in a suit seeking to enjoin enforcement of certain sections of the New York Human Rights Laws on the ground that ERISA pre-empted the state rules. The Court explained that:
 
 
 14
 [i]t is beyond dispute that federal courts have jurisdiction over suits to enjoin state officials from interfering with federal rights.... A plaintiff who seeks injunctive relief from state regulation, on the ground that such regulation is pre-empted by a federal statute which, by virtue of the Supremacy Clause of the Constitution, must prevail, thus presents a federal question which the federal courts have jurisdiction ... to resolve.
 
 
 15
 Shaw, 463 U.S. at 96 n. 14, 103 S.Ct. at 2899 n. 14 (citations omitted). Since CTANY is seeking to enjoin state officials from enforcing a state regulation that interferes with what CTANY asserts are federally protected rights, we conclude that the district court had subject matter jurisdiction to hear this action. See West 14th St. Comm. Corp. v. 5 West 14th Owners Corp., 815 F.2d 188, 195-96 (2d Cir.) (action for injunctive relief on pre-emption grounds is coercive action sufficient to invoke jurisdiction of the federal court), cert. denied, 484 U.S. 850, 108 S.Ct. 151, 98 L.Ed.2d 107 (1987); Stone & Webster Engineering Corp. v. Ilsley, 690 F.2d 323, 327-38 (2d Cir.1982) (same), aff'd without opinion, 463 U.S. 1220, 103 S.Ct. 3564, 77 L.Ed.2d 1405 (1983).
 
 III
 
 16
 In determining whether a federal law pre-empts a state regulation, "our task is to ascertain Congress' intent in enacting the federal statute at issue." Shaw, 463 U.S. at 95, 103 S.Ct. at 2898, 77 L.Ed.2d 490 (1983). Where there are persuasive indicia that Congress intended exclusive federal regulation of the sphere in question, then the state act cannot stand. Jones v. Rath Packing Co., 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977). Absent such an intent, the state rule will only fall if it actually conflicts with the federal law. See Florida Lime & Avocado Growers v. Paul, 373 U.S. 132, 142-43, 83 S.Ct. 1210, 1217-18, 10 L.Ed.2d 248 (1963). In order to discern Congress' intended pre-emptive reach under the Cable Act, it is helpful to first examine the regulatory terrain on which the Cable Act was written.
 
 
 17
 Prior to 1960, the Federal Communications Commission ["FCC" or "Commission"] disclaimed any power to regulate cable television. The FCC reasoned that since cable companies were neither common carriers nor broadcasters, they fell outside the purview of the Communications Act of 1934, 47 U.S.C. § 151 et seq. See United States v. Southwestern Cable Co., 392 U.S. 157, 164, 88 S.Ct. 1994, 1998, 20 L.Ed.2d 1001 (1968).
 
 
 18
 As cable TV gradually developed from providing a common, powerful antenna to remote regions that would otherwise have been without normal TV reception into "a national communications system, in which signals from selected broadcasting centers [were] transmitted to metropolitan areas throughout the country," id., the FCC began to express more regulatory interest.
 
 
 19
 By 1965, in an effort to protect local broadcasters threatened by competition from cable companies, the FCC promulgated a series of rules restricting the ability of cable TV companies to import distant broadcast signals. See Rules re Microwave-Served CATV, 38 F.C.C. 683 (1965). In 1968, in rejecting a cable industry challenge to these regulations, the Supreme Court endorsed the FCC's assertion of regulatory authority over cable TV, but confined the Commission's authority to "that reasonably ancillary to the ... Commission's various responsibilities for the regulation of television broadcasting." Southwestern Cable, 392 U.S. at 178, 88 S.Ct. at 2005. Thus, FCC regulation of cable television was originally aimed at, and justified by, the need to protect local television broadcasters from the cable company's ability to import desirable, distant signals.
 
 
 20
 So long as the FCC saw its job as protecting broadcast television, the FCC had no reason to regulate the rates charged by cable companies. The first tentative foray into rate regulation did not come until 1974, when the FCC announced its intent to pre-empt local regulation of "specialized programming for which a per-program or per-channel charge is made." Clarification of the Cable Television Rules and Notice of Proposed Rulemaking and Inquiry in Docket Nos. 20018 et al., 46 F.C.C.2d 175, 199 (1974). The FCC's authority to pre-empt local rate regulation was not confirmed by the courts until 1978. See Brookhaven Cable TV, Inc. v. Kelly, 573 F.2d 765, 767 (2d Cir.1978), cert. denied, 441 U.S. 904, 99 S.Ct. 1991, 60 L.Ed.2d 372 (1979).
 
 
 21
 Responding to the absence of federal rate regulation in the 1960's and early 1970's, municipalities extracted agreements from the cable companies to submit to local rate regulation in return for an exclusive franchise with permission to use the city's rights of way to wire customers. Cable companies thus operated under a complex, dual system of regulation, subject both to franchise agreements made with states and municipalities aimed at keeping rates low and FCC regulation designed to protect local broadcasters by limiting distant signal transmission. The precise boundaries between where federal power ended and state authority began, however, were never clear.
 
 
 22
 The FCC made its first effort to define the boundaries of federal and state regulation in 1972. See Cable Television Report and Order, 36 F.C.C.2d 143, 207-10 (1972). The FCC attempted to establish a " 'deliberately structured dualism' whereby local governments would be responsible for selecting franchises, pursuant to minimum standards established by the Commission, while the Commission retained exclusive authority over all operational aspects of cable communication, including technical standards and signal carriage." NY State Comm'n on Cable TV v. FCC, 749 F.2d 804 (D.C.Cir.1984). See also Capital Cities Cable, Inc. v. Crisp, 467 U.S. 691, 702, 104 S.Ct. 2694, 2702, 81 L.Ed.2d 580 (1984). However, in 1978, the FCC, dissatisfied with the dual system, eliminated most of the minimum franchise standards, and suggested that the states use the old standards as voluntary guidelines. See H.R.Rep. No. 98-934, 98th Cong.2d Sess. 23, reprinted in 1984 United States Code, Cong. & Admin.News 4655, 4660 (1984). The FCC thus ceded virtually all franchising authority to the states.
 
 
 23
 The relative spheres of state and federal influence were further altered in the 1970's by two Supreme Court decisions. In United States v. Midwest Video Corp., 406 U.S. 649, 92 S.Ct. 1860, 32 L.Ed.2d 390 (1972) (Midwest I ), the Supreme Court upheld an FCC rule requiring cable companies wishing to carry the signals of broadcast stations to also originate programming of their own.[1] Rather than attempting to find a protectionist justification for the Commission's rule, the Court instead expanded the "ancillary to television broadcasting" rationale of Southwestern Cable to include rules designed to advance programming diversity. See id. 406 U.S. at 669, 92 S.Ct. at 1871.
 
 
 24
 Seven years later, in FCC v. Midwest Video Corp., 440 U.S. 689, 99 S.Ct. 1435, 59 L.Ed.2d 692 (1979) (Midwest II ), the Court trimmed the reach of the diversity rationale by striking down, as outside the scope of the Commission's authority, a rule requiring cable companies to allocate four separate channels to public, educational, local governmental and leased access users. The Court explained that the rule left the cable companies with no editorial control over the use of the public access channels. Such a removal of editorial control, though perhaps serving the goal of programming diversity, conflicted with other provisions of the Communications Act of 1934 that expressed "Congress' stern disapproval ... of negation of the editorial discretion otherwise enjoyed by broadcasters and cable operators alike." Midwest II, 440 U.S. at 708, 99 S.Ct. at 1445. Accordingly, the Court concluded that the rule was outside the scope of the FCC's authority.
 
 
 25
 Thus, after Midwest II, the FCC could regulate the cable industry only so long as the Commission's rules were reasonably ancillary to broadcasting goals (defined either as diversity of programming or protection of local broadcasters) and so long as the rules did not unduly trench on the editorial control of broadcasters.
 
 
 26
 Gradually, as the cable industry developed the technology to show first run movies and live sporting events, the FCC began to shift from viewing cable as merely a threat to established broadcasters to viewing cable as a significant communications media of its own. Accordingly, the FCC began removing its own protectionist rules. However, since any attempt to promote programming diversity by imposing affirmative obligations on cable companies would run afoul of Midwest II's command not to interfere with editorial autonomy, the FCC was limited to attempts to pre-empt state rules that threatened to inhibit the growth of the cable industry. By 1983, the FCC had pre-empted local rate regulation of premium cable services and limited the fees that a franchising authority could charge a cable TV operator for the franchise rights. See American Civil Liberties Union v. F.C.C., 823 F.2d 1554, 1558-59 (D.C.Cir.1987), cert. denied, 485 U.S. 959, 108 S.Ct. 1220, 99 L.Ed.2d 421 (1988).
 
 
 27
 In 1984, the regulatory landscape shifted dramatically. In Capital Cities Cable, Inc. v. Crisp, 467 U.S. 691, 104 S.Ct. 2694, 81 L.Ed.2d 580 (1984), the Supreme Court ruled that FCC regulations pre-empted an Oklahoma law prohibiting cable companies from retransmitting out-of-state alcoholic beverage commercials. The Court pointed out the conflicts between the state rule and existing federal regulation and noted that while the FCC had "recently relaxed its regulation of importation of distant broadcast signals", the Commission had nonetheless claimed for itself the entire power to regulate cable signal carriage. Id. at 704-05, 104 S.Ct. at 2703-04. In reaching this conclusion, the Court abandoned Southwestern Cable's limits on federal authority. The Court did not mention the "reasonably ancillary" requirement and instead upheld the FCC's exclusive authority to regulate signal carriage on the ground that the "Commission has determined that only federal preemption of state and local regulation can assure cable systems the breathing space necessary to expand vigorously and provide a diverse range of program offerings to potential cable subscribers in all parts of the country." Capital Cities, 467 U.S. at 708, 104 S.Ct. at 2705. Thus, the Court placed within the FCC's discretion the power to pre-empt virtually any state regulation of the cable industry.
 
 
 28
 Armed with this new authority, the FCC aggressively began to pre-empt local efforts to regulate rates, see In re Community Cable TV, Inc., 56 Rad.Reg.2d (P & F) 735 (1984) (pre-empting local regulation of rates for tiers of cable service), and to set franchise fees, see In re City of Miami, 56 Rad.Reg.2d (P & F) 458 (1984) (invalidating franchise charge of 11% of the operators' gross revenue, even though the operator had agreed to the charge in the franchising agreement).
 
 
 29
 In response to the fluid and ever-changing balance between state and federal authority over cable television, Congress passed the Cable Communications Policy Act of 1984 in order to "provide and delineate within Federal legislation the authority of Federal, state and local governments to regulate cable systems." H.Rep. at 22, reprinted in 1984 U.S.C.C.A.N. at 4655, 4659.
 
 
 30
 In some areas, the Act advances the regulatory power of states and localities at the expense of the FCC. Thus, while states may set franchise fees, subject to limits provided in the Act, "[a]ny Federal agency may not regulate the amount of the franchise fees paid by a cable operator, or regulate the use of funds derived from such fees." 47 U.S.C. § 542(h)(2), (i). Further, although the Act creates procedural guidelines to govern franchise renewal proceedings, the substantive renewal decision is left to the state franchising authority. 47 U.S.C. § 546.
 
 
 31
 The Act also authorizes states to regulate the direct business relationship between cable operators and subscribers. See 47 U.S.C. § 552; H.Rep. at 79, reprinted in 1984 U.S.C.C.A.N. at 4716. This direct business relationship includes "requirements related to interruption of service; disconnection; rebates and credits to customers; deadlines to respond to consumer requests or complaints; the location of the cable operator's consumer service offices; and the provision to customers (or potential customers) of information on billing or services." H.Rep. at 79, reprinted in 1984 U.S.C.C.A.N. at 4655, 4716.
 
 
 32
 In other areas, the Act divests both the states and the FCC of regulatory authority. Thus, neither the states nor the FCC can interfere with the Act's rules for designation of channel capacity for commercial use. 47 U.S.C. § 532(b)(2). Similarly, neither can "impose requirements regarding the provision or content of cable services, except as expressly provided in this subchapter." 47 U.S.C. § 544(f)(1).
 
 
 33
 With respect to rate regulation, the act largely pre-empts all regulation of the rates charged by cable companies. Section 543(a) provides that:
 
 
 34
 Any Federal agency or State may not regulate the rates for the provision of cable services except to the extent provided in this section.
 
 
 35
 The one exception to the general preclusion of rate regulation is for cable systems not currently facing effective competition. § 543(b). Where the FCC has determined that effective competition does not exist, the states may impose rate regulation, but only for the provision of basic cable service. § 543(b)(1). Additionally, the Act allows, for two years following the passage of the Act, the states to regulate rates for the provision of basic cable service, § 543(c)(1), and for "the initial installation or the rental of 1 set of the minimum equipment which is necessary for the subscriber's receipt of basic cable service." § 543(c)(3).
 
 
 36
 In short, in the Cable Act Congress attempted to create a comprehensive and reticulated scheme for regulating cable television and to define the relative spheres of authority of the states and the federal government. The Act cut back on federal authority in some places--particularly control of franchising. The Act removed state authority in others--like regulation of rates for the provision of basic service. The question for this appeal is where downgrade charges fit in this tightly defined structure. We turn now to the merits of the case.
 
 IV
 
 37
 The requirements for establishing federal pre-emption are familiar. Where Congress expressly states the scope of its pre-emptive reach, the only question is whether the state act falls within the federal sphere. See Schneidewind v. ANR Pipeline Co., 485 U.S. 293, 299, 108 S.Ct. 1145, 1150, 99 L.Ed.2d 316 (1988). Where there is no such express statement, Congressional intent to occupy a given field to the exclusion of state law may be inferred "where the pervasiveness of the federal regulation precludes supplementation by the States, where the federal intent in the field is sufficiently dominant, or where 'the object sought to be obtained by the federal law and the character of obligations imposed by it ... reveal the same purpose.' " Id. at 300, 108 S.Ct. at 1151 (quoting Rice v. Sante Fe Elevator Corp., 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947)). Even where Congress has not expressed an intent to pre-empt the entire field of regulation, a particular state rule will be pre-empted when it is impossible to comply with both state and federal law, Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142-43, 83 S.Ct. 1210, 1217-18, 10 L.Ed.2d 248 (1963), or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress. Hines v. Davidowitz, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941).
 
 
 38
 CTANY presents two alternative arguments purporting to demonstrate that the Cable Act pre-empts state regulation of downgrade charges. First, CTANY argues that downgrade charges are rates for the provision of cable services. Accordingly, they fall within the express pre-emption provisions of the Cable Act. Second, CTANY argues that even if downgrade charges are not rates for the provision of cable services, they are sufficiently closely related to such rates that Congress must have meant to foreclose regulation of them when it chose to pre-empt all regulation of rates for the provision of cable services. These claims will be addressed in turn below.
 
 
 39
 CTANY has not argued that there is a sufficient conflict between the state and federal rules to warrant pre-emption in the absence of a finding of a Congressional intent to pre-empt. Accordingly, we express no view on this question.
 
 
 40
 * The parties agree that if a downgrade charge is a rate for the provision of cable services, then section 543 of the Cable Act pre-empts this state regulation. The district court concluded that downgrade charges were not such rates since nothing was "provided" to the customer. Rather, because of the tiered structure of cable programming in which each progressively higher tier contains all the programming offered in all the lower tiers, when a customer downgrades to a lower tier, programming is removed without being replaced by any additional programming. Accordingly, the district court found no pre-emption.
 
 
 41
 CTANY offers three responses to this argument. First, they contend that "cable services" includes not only programming, but also the facilities that enable the customer to receive programming--such as the wire and the converter box. In support of this claim, CTANY points to section 543(c)(3) of the Act and to portions of the legislative history. Section 543(c)(3) authorizes states to regulate the charges imposed by cable companies not facing competition for the initial installation of the minimum equipment necessary to receive basic programming services. CTANY contends that such an express authorization of regulation would be unnecessary unless section 543(a) generally pre-empted state regulation of the rates for installation of equipment. This inference of section 543(a)'s pre-emptive reach is buttressed by the House Report, which explains that under section 543(c), "if several types of equipment, e.g., converters, are offered to subscribers to receive basic service, only the minimum converter necessary for receiving basic cable service is subject to rate regulation." H.Rep. at 67, reprinted in 1984 U.S.C.C.A.N. at 4704. Accordingly, CTANY argues that cable service includes not only programming but also the machinery necessary to facilitate programming.
 
 
 42
 We agree, and the defendants concede, that the term "cable services" is not limited to cable programming. However, this argument is insufficient to carry the day. It is axiomatic that in interpreting a statute the court must " 'give effect, if possible, to every clause and word of [the] statute.' " United States v. Menasche, 348 U.S. 528, 538-39, 75 S.Ct. 513, 519-20, 99 L.Ed. 615 (1955) (quoting Montclair v. Ramsdell, 107 U.S. 147, 152, 2 S.Ct. 391, 394, 27 L.Ed. 431 (1882)). Section 543(a) pre-empts all "rates for the provision of cable services," not "all rates for cable services." Thus, CTANY must still establish the linguistically unlikely proposition that the customer is "provided" with cable service when services (defined as both facilities and programming) are removed. CTANY has pointed to nothing in the text or history of the statute to support such a tortured reading of "provision."
 
 
 43
 CTANY's second argument is that the FCC has determined that downgrade charges are rates for the provision of cable services. CTANY points particularly to an FCC interpretation of section 543(b) to support this claim. In the process of explaining a new rule altering the standards for determining when a cable company faces effective competition, the Commission stated:
 
 
 44
 "[i]n those situations where rate regulation is imposed under the new effective competition test, it is important to delineate what is and what is not included in the definition of basic service. Basic service includes not only the recurring monthly charge for those tiers of service that include local broadcast signals, but also the cost to provide the equipment necessary to receive the service and the charge for the original or downgrade installation to obtain basic service."
 
 
 45
 Reexamination of the Effective Competition Standard for the Regulation of Cable Television Basic Service Rates, Report and Order and Second Further Notice of Proposed Rule Making, 6 F.C.C.R. 4545, 4557 n. 72. (1991) (emphasis added)
 
 
 46
 From this statement about the scope of section 543(b), CTANY infers that section 543(a) pre-empts state regulation of downgrade charges.
 
 
 47
 In analyzing this claim, it is important to focus on the context of the footnote. The footnote, in defining basic service to include downgrade charges, did not purport to address what constitutes "rates for the provision of cable services" for section 543(a) pre-emption purposes. Indeed, the section to which the footnote refers had the effect of expanding state regulation, not pre-empting it. These facts cast doubt on whether the FCC intended footnote 72 to have any relevance to the case at hand.
 
 
 48
 These doubts are critical because, in order for an FCC determination to have pre-emptive force, we must find (1) that the Commission intends its pronouncement to pre-empt state law and (2) that the Commission is acting within the scope of its delegated authority. Fidelity Federal Sav. & Loan Ass'n v. De La Cuesta, 458 U.S. 141, 154, 102 S.Ct. 3014, 3023, 73 L.Ed.2d 664 (1982). The FCC determination at issue here fails the first half of this test. There is no indication that the FCC considered the pre-emptive reach of its statement when it declared, in the 72nd footnote of a proposed rule involving a different subsection of the statute, that downgrade charges were part of basic cable service. As noted above, the effect of the declaration was to authorize, rather than foreclose, state regulation, since section 543(b) authorizes the states to regulate cable companies that do not face effective competition. We are unable to conclude from this expansion of state authority that the FCC intended to pre-empt the state regulation in question.
 
 
 49
 Our conclusion that the footnote lacks pre-emptive intent is further buttressed by the fact that at the time the FCC rule containing it was issued, the Michigan Court of Appeals had already held in Comcast Cablevision of Sterling Heights, Inc. v. City of Sterling Heights, 178 Mich.App. 117, 443 N.W.2d 440 (Mich.Ct.App.1989), leave to appeal denied, 434 Mich. 876, (1990), that the Cable Act did not pre-empt state regulation of downgrade charges. Surely if the FCC had meant to reverse the Sterling Heights decision, or to express any view on whether section 543(a) pre-empts state regulation of downgrade charges, it would have mentioned the case, or at least the general subject, in the footnote in question. The failure to do so powerfully indicates that the FCC had no such pre-emptive intent. See Hillsborough County v. Automated Medical Labs., Inc., 471 U.S. 707, 718, 105 S.Ct. 2371, 2377, 85 L.Ed.2d 714 (1985) ("because agencies normally address problems in a detailed manner and can speak through a variety of means ... we can expect that they will make their intentions clear if they intend for their regulations to be exclusive").
 
 
 50
 CTANY's final argument is that the context in which the Cable Act uses the word "provision" forces the conclusion that a provision occurs both when services are reduced and when they are enhanced. CTANY contends that the purpose of section 543 was to curtail rate regulation, and that reading "provision" to apply only to service enhancements unnecessarily narrows Congress' pre-emptive reach. This argument misses the fact that Congress' purpose in section 543 was not to curtail regulation in the abstract but rather to do so in order to allow market forces to control the rates charged by cable companies. See H.Rep. at 25, reprinted in 1984 U.S.C.C.A.N. at 4662; S.Rep. No. 67, 98th Cong., 1st Sess. 11 (1983) ("the committee believes that marketplace forces, rather than Government regulation, should prevail"). Downgrade charges, however, insulate cable companies from market forces. Charging the customer who wishes to downgrade from a $20 a month service to a $10 a month service $100 for the privilege sharply limits the incentive to downgrade. Thus, the downgrade charge diminishes the force of declining demand for premium services in the marketplace by limiting the financial benefit to customers from downgrading to a lower level of service. Accordingly, in this instance reading "provision" in a common sense fashion to apply to enhancing but not reducing service does not contravene the Congressional purpose of allowing market forces to prevail.
 
 
 51
 Since a reduction in service is not a provision of service, and since the FCC has not spoken clearly on the matter, we conclude that the Cable Act does not expressly pre-empt state regulation of downgrade charges.
 
 B
 
 52
 CTANY also contends that even if downgrade charges are not rates for the provision of cable services, the state regulation is still pre-empted since the regulation effectively regulates other rates which unquestionably are for the provision of cable services. From this, CTANY concludes that Congress must have intended to pre-empt state regulation of downgrade charges.
 
 
 53
 We agree with CTANY that state regulation of downgrade charges may have some affect on the rates cable companies charge for basic and premium cable service. In those systems in which downgrades impose real costs on the cable companies, if the cable company cannot recoup the costs directly, the company will have to spread those costs to the consumers indirectly, perhaps by raising the rates for basic and premium service.
 
 
 54
 However, CTANY's argument proves too much. In every case where a state regulation imposes costs on a cable company, the company will seek to recoup those costs by raising rates. To hold that therefore every cost-imposing state regulation is pre-empted would conflict with the Cable Act's express authorization of state regulation and with the well established rule that even where a Federal statute pre-empts an entire field of regulation, "every state statute that has some indirect effect [on that field] ... is not pre-empted." Schneidewind v. ANR Pipeline Co., 485 U.S. 293, 308, 108 S.Ct. 1145, 1155, 99 L.Ed.2d 316 (1988) (Federal Energy Regulatory Commission has exclusive jurisdiction over rates and facilities of natural gas companies, but not every law that affects rates and facilities pre-empted); Metropolitan Life Ins. Co. v. Massachusetts, 471 U.S. 724, 753-56, 105 S.Ct. 2380, 2396-97, 85 L.Ed.2d 728 (1985) (National Labor Relations Act pre-empts field of labor relations but does not pre-empt state minimum wage laws, even though those laws affect collective bargaining). The question here is whether the impact on rates for the provision of services is sufficient to force the conclusion that Congress must have intended to pre-empt state regulation of downgrade charges.
 
 
 55
 We are unable to discern such a Congressional intent. First, the Cable Act expressly authorizes state regulation in a whole host of fields that will affect the rates cable companies charge customers for the provision of cable services. For example, the states have the power to set franchise fees, § 542(a), and the cable companies may pass through to subscribers any costs and must pass through any savings resulting from changes in these fees. § 542(c) (increases); § 542(e) (decreases). Similarly, as CTANY conceded at oral argument, the states may regulate charges associated with complete disconnections of service, and the cable companies may pass those costs through to consumers. § 552; H.Rep. at 79, reprinted in 1984 U.S.C.C.A.N. at 4716. In short, the structure of the Cable Act is wholly inconsistent with the claim that Congress intended to pre-empt all state regulations with an affect on the rates cable companies charge for the provision of cable services. If anything, the fact that Congress left regulation of complete disconnections to the states indicates that downgrades, which are in essence partial disconnections, are also within the state's regulatory province.
 
 
 56
 Further, the language of the pre-emption clause at issue fails to evince an intention to carve out a wide area free of state regulation. Where Congress has intended to pre-empt all state laws affecting a particular subject, it has employed language well suited to the task. For example, the Employment Retirement Income Security Act of 1974 (ERISA) pre-empts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan" covered by ERISA. 29 U.S.C. § 1144(a) (emphasis added). The courts have consistently interpreted the words "relate to" in broad, common sense fashion, to include virtually everything touching on ERISA plans. See, e.g., Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987) (ERISA pre-empts state law cause of action for improper processing of claim for benefits); R.R. Donnelley & Sons Co. v. Prevost, 915 F.2d 787 (2d Cir.1990) (ERISA pre-empts state law requiring employers to continue insurance coverage for employees entitled to workers compensation), cert. denied, U.S. ----, 111 S.Ct. 1415, 113 L.Ed.2d 468 (1991); Howard v. Gleason Corp., 901 F.2d 1154 (2d Cir.1990) (ERISA pre-empts state law regulating procedures for notifying group policy holder of right to switch to individual policy). Here, by contrast, giving the words in the pre-emption clause their broad, common sense meaning, Pilot Life, 481 U.S. at 47, 107 S.Ct. at 1552, we cannot conclude that Congress intended to reach everything that relates to rate regulation. Instead, we think Congress meant to pre-empt only those state rules that regulate rates charged by cable companies for providing services to customers.
 
 
 57
 This conclusion finds support not only in the structure and language of the statute, but also in the legislative context in which the statute was enacted. The Cable Act came on the heels of decades of uncertainty about the relative spheres of state and federal authority over cable television. See Part III supra. Congress attempted to free the cable industry from this confusion by clearly defining the relative spheres of state and federal authority, and by imposing deregulation so as to maximize the influence of the market on cable rates. See Part III supra. In light of this history, it seems likely that Congress selected the phrasing of the pre-emption clause with great precision. Cf. Motor Vehicles Manufacturers Assn. v. Abrams, 899 F.2d 1315, 1319 (2d Cir.1990) (presence of express pre-emption provision in one section of statute is reason not to imply one in another, since "Congress knew how to preempt in this very statute when it wanted to."), cert. denied, --- U.S. ----, 111 S.Ct. 1122, 113 L.Ed.2d 230 (1991). Accordingly, we doubt that Congress meant to pre-empt all state laws that relate to the regulation of rates for the provision of cable services.
 
 
 58
 Finally, this case is quite unlike Schneidewind, on which CTANY relies. There, the Court found that the Natural Gas Act of 1938, 15 U.S.C. § 717 et seq., pre-empted a Michigan law regulating the issuance of securities by public utilities who transported natural gas within the state. The Court ruled that under the Gas Act only the Federal Energy Regulatory Commission (FERC) could regulate the rates and facilities of natural gas companies. The Court then determined that the Gas Act pre-empted the state rule since, although the state law nominally regulated securities, the central purpose of the state law was to regulate the rates and facilities of natural gas companies. Schneidewind, 485 U.S. at 308-09, 108 S.Ct. at 1155-56. Here by contrast, there can be no doubt that the central purpose of the state regulation is to protect consumers, not to indirectly regulate rates outside of the state's direct grasp. After all, the only affect this regulation will have on other rates is to raise them. Surely, the state has no regulatory interest in indirectly forcing the cable companies to raise their own rates. Indeed, CTANY does not call into question the state's motives. Accordingly, Schneidewind does not support the claim that the Cable Act pre-empts state regulation of downgrade charges.
 
 
 59
 In sum, neither the language of the pre-emption clause, nor the structure of the statute, nor the regulatory and legislative background, nor the relevant case law supports CTANY's claim that the Cable Act expressly pre-empts all state regulation that will effect rates for the provision of cable services. Accordingly, we cannot conclude that Congress intended to pre-empt state regulation of downgrade charges.
 
 CONCLUSION
 
 60
 We conclude that the Cable Act does not pre-empt state regulation of downgrade charges. The judgment of the district court is hereby affirmed.
 
 
 
 [1]
 The mandatory origination rule was repealed in 1974. See Report and Order in Docket No. 19988, 49 F.C.C.2d 1090, 1105-06 (1974)