986 F.2d 615
 61 USLW 2544, Prod.Liab.Rep. (CCH) P 13,440
 TOY MANUFACTURERS OF AMERICA, INC., Plaintiff-Appellant,
v.
Richard BLUMENTHAL, Attorney General of the State of
Connecticut, and Gloria Schaffer, Commissioner, Department
of Consumer Protection, State of Connecticut, in their
representative capacities, Defendants-Appellees.
 No. 840, Docket 92-9174.
 United States Court of Appeals,
Second Circuit.
 Argued Dec. 14, 1992.
Decided Dec. 22, 1992.
Opinion Filed Feb. 22, 1993.
 
 1
 Frederick N. Locker and Aaron Locker, New York City (Locker Greenberg & Brainin, P.C.), for plaintiff-appellant.
 
 
 2
 Richard Blumenthal, Atty. Gen. of the State of Conn. (Robert M. Langer, Neil G. Fishman and Megan O'Neill, Asst. Attys. Gen.), for defendants-appellees.
 
 
 3
 Before: CARDAMONE and PRATT, Circuit Judges, and LASKER, District Judge.*
 
 LASKER, District Judge:
 
 4
 This case presents a challenge to Connecticut's authority to regulate toys designed for children between the ages of three and seven which present a risk of "choking, aspiration or ingestion" to children under three. The plaintiff, Toy Manufacturers of America, Inc. ("TMA"),[1] asserts that regulations promulgated by the Consumer Product Safety Commission ("CPSC") pursuant to the Federal Hazardous Substances Act ("FHSA"), 15 U.S.C. §§ 1261-1277 (1982), preempt state authority to regulate the subject. The District Court disagreed and denied a preliminary injunction enjoining the enforcement of a Connecticut statute enacted June 1, 1992, which requires warning labels on toys designed for children between three and seven which pose a danger of choking, aspiration or ingestion because of small parts to children under the age of three. The issue on appeal is whether the Connecticut law is preempted. We hold that it is not, and affirm.
 
 I.
 
 5
 The regulation of health, safety and welfare has traditionally been the province of the states. However, in the past several decades, a number of areas of regulation traditionally controlled by the states such as food and drugs, occupational health and safety, and the environment, have come under federal management. TMA claims that "small parts regulation" is an area over which the federal government has asserted exclusive control under the Federal Hazardous Substances Act, 15 U.S.C. §§ 1261-1277 (1982) ("FHSA" or the "Act").
 
 
 6
 Where exclusive federal regulation of a subject exists, state laws on the same subject are "without effect."
 
 
 7
 Article VI of the Constitution provides that the laws of the United States "shall be the supreme Law of the Land; ... any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." Art. VI, cl. 2. Thus, since our decision in McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 427, 4 L.Ed. 579 (1819), it has been settled that state law that conflicts with federal law is "without effect."
 
 
 8
 Cipollone v. Liggett Group, Inc., --- U.S. ----, ----, 112 S.Ct. 2608, 2617, 120 L.Ed.2d 407 (1992) (citation omitted).
 
 
 9
 The Federal Hazardous Substances Act was enacted in 1960 in response to mounting evidence of the dangers, particularly to children, of unlabeled hazardous household products. The Act focuses on consumer products intended for use or packaged in a form suitable for use in the household or by children. The scope of its coverage as to these products is extremely broad. Nevertheless, the Act does not purport to establish a comprehensive federal scheme of regulating hazardous substances found in the household. In fact, the FHSA does not itself ban any items or require any precautions. Instead, it authorizes regulations to be issued by the Consumer Product Safety Commission ("CPSC" or "Commission") pursuant to the Act, and sets guidelines to be followed by the CPSC in promulgating those regulations.
 
 
 10
 The FHSA also permits a system of partial preemption, under which, in an area in which the Commission has not acted, state regulations may supplement the regulations adopted by the CPSC. The Act's preemption provision states:
 
 
 11
 if ... a requirement is established to protect against a risk of illness or injury associated with a hazardous substance, no State or political subdivision of a State may establish or continue in effect a requirement applicable to such substance and designed to protect against the same risk of illness or injury unless such requirement is identical to the requirement established under such regulations.
 
 
 12
 15 U.S.C. § 1261 Note § 18(b)(1)(B) (1982). That is, preemption obtains only where a state action regulates the same "hazardous substance" and the same "risk of illness or injury associated with [that] hazardous substance" which a FHSA regulation regulates.
 
 
 13
 "Hazardous substance" is a term of art in the FHSA. Section 2(f)(1)(D) of the statute defines the phrase to include, among other things, "[a]ny toy or other article intended for use by children which the Secretary by regulation determines, in accordance with section 1262(e) of this title, presents an electrical, mechanical, or thermal hazard." 15 U.S.C. § 1261(f)(1)(D) (1982).
 
 
 14
 The CPSC adopted the two small parts regulations at issue here--now codified as 16 C.F.R. § 1500.18(a)(9) and 16 C.F.R. § 1501--on June 15, 1979. The FHSA authorizes the promulgation of both banning regulations and labeling regulations; the regulations at issue are banning regulations.
 
 
 15
 Section 1500.18--titled "Banned toys and other banned articles intended for use by children"--bans the introduction into interstate commerce of a number of toys and other children's articles deemed to pose either a mechanical, thermal, or electrical hazard. 16 C.F.R. § 1500.18 (1992) and 15 U.S.C. § 1263(a) (1982). Subsection 1500.18(a)(9)--the section at issue here--defines as a hazardous substance: "Any toy or other article intended for use by children under 3 years of age which presents a choking, aspiration, or ingestion hazard because of small parts as determined by part 1501 ..." 16 C.F.R. § 1500.18(a)(9) (1992).
 
 
 16
 Part 1501--titled "METHOD FOR IDENTIFYING TOYS AND OTHER ARTICLES INTENDED FOR USE BY CHILDREN UNDER 3 YEARS OF AGE WHICH PRESENT CHOKING, ASPIRATION, OR INGESTION HAZARDS BECAUSE OF SMALL PARTS" (capitalized in original)--supplements § 1500.18(a)(9). 16 C.F.R. § 1501 (1992). Part 1501 is a descriptive provision only, whose sole function is to describe what is banned by § 1500.18(a)(9):
 
 
 17
 This Part 1501 describes certain articles that are subject to § 1500.18(a)(9); lists certain articles that are specifically exempted; and provides a test method for determining whether an article is hazardous to children under 3 because it, or one of its components that can be detached or broken off during normal or reasonable foreseeable use, is too small.
 
 
 18
 16 C.F.R. § 1501.1 (1992).
 
 
 19
 In determining the preemptive effect of the CPSC's small parts regulations, it is useful to review the history of the CPSC's actions in this area. In 1979, the CPSC considered the risk to children of varying ages (up to 10) of small parts but promulgated a rule only with respect to the risk of injury from small parts in toys and other articles intended for children under three when it issued § 1500.18(a)(9) and Part 1501. In 1979, the CPSC considered a proposal to require warning labels on certain products intended for use by children up to age nine which posed a small parts hazard, but, on August 30, 1979, decided to take no action on the proposal. (Joint Appendix 17a).
 
 
 20
 Between 1988 and 1990, some tinkering with the definition of what constituted a "small part" was considered, but ultimately rejected by the Commission. On the same date that this proposal was rejected--June 26, 1990--the CPSC revisited the question of whether it should promulgate a warning label regulation with respect to toys still on the market which posed a small parts hazard. On that date, the Commission published an Advance Notice of Proposed Rulemaking ("ANPR") to begin a rule making proceeding to consider requiring cautionary choking hazard warning labels on toys for children aged three to approximately six if the toys presented potential choking, aspiration or ingestion hazards to children under the age of three. However, on March 18, 1992, after preliminary evidence was gathered, the Commission voted to terminate the rule making proceedings. As a result of this history, the present regulations, found at § 1500.18(a)(9) and Part 1501, only ban sales of toys (and other children's articles) intended for use by children under three which pose a choking, aspiration or ingestion hazard because of small parts. Toys which pose the same danger but are intended for use by children three or older are not banned and continue to be sold.
 
 
 21
 Defendants and amici U.S. Public Interest Research Group contend that choking on small parts continues to be one of the leading causes of toy-related death, and claim that a warning label requirement is necessary because parents may, and often do, interpret an age label on a toy (that states, for example, "3-up") as no more than a suggestion regarding the developmental level of the user without recognizing it as a warning that a toy contains dangerous small parts.
 
 
 22
 In response to the concern stated above and in the wake of federal inaction in this area, on June 1, 1991, the Connecticut legislature enacted the law under attack here. The law prohibits the introduction into commerce of any toy or other article marketed or determined to be for the use of children between the ages of three and seven which does not bear "a conspicuous warning label that clearly and conspicuously communicates that the contents contain small parts which pose a hazard for children under the age of three." Conn.Gen.Stat. § 21a-337, as amended by 1992 Conn.Pub.Acts No. 92-127, § 1, and 1992 Conn.Pub.Acts (May Session) No. 92-11, § 57. In specifying what toys are covered by the Act, the law adopts the federal CPSC definition regarding age of intended use. The Connecticut statute reads:
 
 
 23
 the introduction or delivery for introduction into commerce, AFTER DECEMBER 31, 1992, of any toy or other article for sale in this state and marketed for the use of children between the ages of three and seven, or determined to be for the use of children between the ages of three and seven by the federal Consumer Product Safety Commission pursuant to 16 CFR Part 1500 et seq., as published in the Federal Register of January 1, 1991, and as from time to time amended, or the commissioner of consumer protection pursuant to chapter 420d, which would be classified as a banned hazardous substance under 16 CFR Part 1501.4(b)(1) of said Federal Register and does not bear [the following conspicuous label: "WARNING-SMALL PARTS POSE CHOKE HAZARD FOR CHILDREN UNDER THE AGE OF THREE"] A CONSPICUOUS WARNING LABEL THAT CLEARLY AND SPECIFICALLY COMMUNICATES THAT THE CONTENTS INCLUDE SMALL PARTS WHICH POSE A HAZARD FOR CHILDREN UNDER THE AGE OF THREE, EXCEPT THAT ANY TOY OR OTHER ARTICLE THAT CONTAINS, AS OF DECEMBER 31, 1992, A SAFETY WARNING LABEL IN SUBSTANTIAL COMPLIANCE WITH THE REQUIREMENTS OF THIS SUBDIVISION SHALL BE DETERMINED BY THE COMMISSIONER TO BE IN COMPLIANCE WITH THIS SUBDIVISION UNTIL OCTOBER 1, 1993.
 
 
 24
 (emphasis added).
 
 
 25
 The Connecticut statute was enacted on June 1, 1992, effective January 1, 1993. On July 21, 1992, TMA commenced this action, seeking a declaration that the statute was invalid because it was (i) preempted by the FHSA, (ii) placed an undue burden on interstate commerce, and (iii) was impermissibly vague as a criminal statute. On July 22, 1992, TMA moved for a preliminary injunction barring the state from enforcing the law.
 
 
 26
 On October 8, 1992, the District Court, in a comprehensive and thoughtful opinion, denied TMA's motion for a preliminary injunction. The court concluded that the "substance" governed by the CPSC regulations at issue was not toys in general which pose a small parts hazard, but only toys intended for use by children under three that pose such a hazard. Accordingly, the court found that the preemption provision of the FHSA did not apply and denied the preliminary injunction on the ground that no likelihood of success on the merits had been proven. The parties do not contest the district court's interpretation of the preliminary injunction standard or its finding of irreparable injury. Neither does TMA contest the district court's finding of no likelihood of success on the merits with regard to its Due Process and Commerce Clause arguments. Accordingly, the sole issue on appeal is the district court's finding of no likelihood of success on the preemption claim.
 
 II.
 
 27
 In determining whether preemption exists, we must "start with the assumption that the historic police powers of the States [are] not to be superseded by ... Federal Act unless that [is] the clear and manifest purpose of Congress." Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947). "[O]ur task is to ascertain Congress' intent in enacting the federal statute at issue." Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 95, 103 S.Ct. 2890, 2898, 77 L.Ed.2d 490 (1983). "The purpose of Congress is the ultimate touchstone." Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 208, 105 S.Ct. 1904, 1910, 85 L.Ed.2d 206 (1985) (citation omitted).
 
 
 28
 In the case at hand, of course, the state action concerns child safety which lies at the heart of the states' police powers.
 
 
 29
 TMA argues first that the Connecticut statute regulates the same "hazardous substance" regulated by the CPSC regulations and thus falls within the express pre-emption provision of the FHSA. TMA contends, in the alternative, that even if the Connecticut statute is not expressly preempted, preemption should be inferred because the Connecticut statute conflicts with the full purposes and objectives of the FHSA.
 
 A.
 EXPRESS PREEMPTION
 
 30
 As indicated above, under the FHSA's preemption clause, preemption is contingent on the prior existence of a CPSC regulation addressing the same "risk" and the same "substance" as the state action. The language of the preemption clause bears repeating
 
 
 31
 if ... a requirement is established to protect against a risk of illness or injury associated with a hazardous substance, no State or political subdivision of a State may establish or continue in effect a requirement applicable to such substance and designed to protect against the same risk of illness or injury unless such requirement is identical to the requirement established under such regulations.
 
 
 32
 15 U.S.C. § 1261 Note § 18(b)(1)(B) (1982).
 
 
 33
 Although the district court found that "the risk at issue in the state and federal regulatory regimes is the same--the risk to children under three of choking on small parts," (Joint Appendix 70a), it concluded that the two regulatory regimes apply to different "substances." Accordingly, the sole question on this appeal in relation to express preemption is whether the CPSC regulations and the Connecticut statute address the same "hazardous substance." The parties agree that if the hazardous substance controlled by the Connecticut statute and the CPSC regulation is the same, then the FHSA's express preemption provision preempts the Connecticut statute.
 
 
 34
 The district court held that the substance governed by the CPSC regulations at issue was not toys in general which pose a small parts hazard, but only toys intended for use by children under three which pose that hazard. By contrast, TMA contends that the hazardous substance sought to be regulated by the CPSC regulations is the "small part" itself, which, according to TMA, can be a piece or component of a children's product or the entire product itself.
 
 1.
 The Terms of the FHSA Regulations
 
 35
 TMA claims that "the age of the user defines the risk of injury and does not necessarily create different 'products.' " In its view, age is only "[t]he means of defining and regulating the risk of injury associated with th[e] 'small part.' " See Appellant's Reply Brief at 6-8.
 
 
 36
 However, nothing in the text of Part 1501 or § 1500.18(a)(9) suggests that those provisions were intended to address small parts in all toys. Section 1500.18(a)(9) refers specifically and exclusively to toys with small parts intended for use by children under 3. It bans "[a]ny toy or other article intended for use by children under 3 years of age which presents a choking, aspiration, or ingestion hazard because of small parts as determined by part 1501 of this chapter." 16 C.F.R. § 1500.18(a)(9) (1992).
 
 
 37
 If the terms of § 1500.18(a)(9) were not enough to establish that only toys intended for use by children under three are targeted by the CPSC small parts regulations, Part 1501 makes this point explicit. In a subsection devoted to describing the scope of § 1500.18(a)(9), Part 1501 expressly states that "the regulation does not apply to toys or other articles which are solely intended for use by children 3 years of age or older," 16 C.F.R. § 1501.2(c) (1992) (emphasis added), and even provides a test for determining which toys and other articles are intended for use by children under 3 years:
 
 
 38
 In determining which toys and other articles are intended for use by children under 3 years (36 months) of age, for purposes of this regulation, the following factors are relevant: the manufacturer's stated intent (such as on a label) if it is a reasonable one; the advertising, promotion, and marketing of the article; and whether the article is commonly recognized as being intended for children under 3.
 
 
 39
 16 C.F.R. § 1501.2(b) (1992).
 
 
 40
 That the "hazardous substance" addressed by § 1500.18(a)(9) is limited to toys intended for use by children under three is also irrefutably demonstrated by the fact that only toys intended for use by children under three were taken off the market. As the district court reasoned:
 
 
 41
 Any toy that is found to be a hazardous substance is, under the FHSA, banned from commerce. 15 U.S.C. § 1261(q)(1). As pointed out above, toys intended for children under three which pose a risk of choking are banned hazardous substances. Conversely, toys intended for older children, even if they subject younger children to some risk of choking, are not hazardous substances and therefore remain on the market. Indeed, the very fact of a toy being permitted in interstate commerce is conclusive proof that it is not a "hazardous substance"--for if it were so designated, it would have to be banned.
 
 
 42
 (Joint Appendix 71a).
 
 2.
 The Federal Decision Not to Regulate
 
 43
 TMA contends that if the court does not find preemption in the text of the regulations themselves, it should infer preemption from the history of the CPSC's federal small parts actions. It claims that "the CPSC has historically considered and rejected labeling as an ineffective means of regulating the risk of injury to children under 3," (Appellant's Reply Brief at 9), and urges us to accord preemptive weight to the CPSC's decision in 1979 and 1992 not to adopt certain small parts regulations.
 
 
 44
 It is true that in some circumstances a federal decision not to regulate may preempt state actions as effectively as a federal decision to regulate:
 
 
 45
 [A] federal decision to forgo regulation in a given area may imply an authoritative federal determination that the area is best left unregulated, and in that event would have as much pre-emptive force as a decision to regulate.
 
 
 46
 Arkansas Elec. Coop. Corp. v. Arkansas Public Serv. Comm'n, 461 U.S. 375, 384, 103 S.Ct. 1905, 1912, 76 L.Ed.2d 1 (1983) (emphasis in original). However, as Justice Scalia stated in Puerto Rico Dept. of Consumer Affairs v. Isla Petroleum Corp., 485 U.S. 495, 503, 108 S.Ct. 1350, 1355, 99 L.Ed.2d 582 (1988), discussing the material quoted above: "That was obviously not meant in an unqualified sense; otherwise, deliberate federal inaction could always imply pre-emption which cannot be." Id. He specified: "Where a comprehensive federal scheme intentionally leaves a portion of the regulated field without controls, then the preemptive inference can be drawn--not from federal inaction alone, but from inaction joined with action." Id. (emphasis in original).
 
 
 47
 Accordingly, the question whether the CPSC's "inaction" constitutes an act of preemption depends first on whether a "comprehensive federal scheme" of small parts regulation exists, and, if it does, whether the Commission intentionally left a portion of the regulated field without control. The record establishes that the Commission recognized that the presence on the market of toys which contained small parts (but were intended for use by children three years of age or older) posed a continuing risk to children under three. Moreover, in 1979 (around the same time it adopted § 1500.18(a)(9) and Part 1501), the Commission considered adopting a regulation requiring small parts warning labels on toys intended for use by children up to age nine. Finally, in 1990-1992, the Commission considered a similar proposal, this time with respect to warning labels on toys intended for use by children between three and six. The Commission rejected the proposal on both occasions.
 
 
 48
 TMA claims that the CPSC's rejection of these proposals constituted a determination "that mandatory labeling of older children's products would not be effective in reducing choking incidents in children under three years of age." (Appellant's Brief at 19). However, the statements submitted by three of the five Commissioners in connection with their March 18, 1992 vote terminating the warning label rule making proceeding, altogether undercut this contention. The Commissioners' statements emphasize that the reason for their nonaction was the statutory limitation on their power to promulgate regulations. For example, the Chairwoman of the Committee stated:
 
 
 49
 I do believe, personally, that warning labels on toys that contain small parts, but are intended for children aged three to five, would be beneficial for adults in their selection of toys for children. This is my subjective evaluation. However, the evidence before this Commission simply does not comport with such a conclusion. Thus, my vote to terminate these proceedings.
 
 
 50
 * * * * * *
 
 
 51
 In the final analysis, the Commission is left with very little hard data. The Commission can not promulgate regulations based upon mere guesswork, subjective inferences or emotional reactions. Thus, I must conclude that there is no legitimate basis, within our statutory scheme, to proceed with this regulatory proposal.
 
 
 52
 (Joint Appendix at 24a-25a) (emphasis added) (statement of Chairwoman Jacqueline Jones-Smith). The Commissioners also emphasized the many demands upon the Commission's time and resources and the Commission's need to "turn[ ] its attention to more serious product safety issues." See Joint Appendix 27a (statement of Commissioner Carol G. Dawson). Such statements obviously do not constitute a final judgment about the efficacy of or need for a warning label requirement.
 
 
 53
 Furthermore, for purposes of preemption analysis, how the rule makers might have viewed the proposal or what the rule makers might have intended in the way of preemption is not the relevant inquiry. As discussed above, in order for preemption to obtain in the area of the states' police powers, Congress (or the agency charged with administering a statute) must make its intent to preempt "clear and manifest."[B]ecause agencies normally address problems in a detailed manner and can speak through a variety of means, including regulations, preambles, interpretive statements, and responses to comments, we can expect that they will make their intentions clear if they intend for their regulations to be exclusive.
 
 
 54
 Hillsborough County v. Automated Medical Labs., Inc., 471 U.S. 707, 718, 105 S.Ct. 2371, 2377, 85 L.Ed.2d 714 (1985). As Justice Scalia remarked in commenting on Congress's authority to establish a regime of federally mandated free market control--which is what TMA argues the CPSC intended here: "[T]o say that it can be created is not to say it can be created subtly." Puerto Rico Dept. of Consumer Affairs, 485 U.S. at 500, 108 S.Ct. at 1350, 99 L.Ed.2d at 582.
 
 
 55
 Here the Commission has not, subtly or otherwise, manifested an intention to shut out state action. Neither the actual words of the CPSC regulations, the statements of the Commissioners explaining their decision not to issue additional regulations, nor any other action by the Commission, indicates an intent to establish a comprehensive scheme of or assert exclusive control over the area of small parts regulation.
 
 
 56
 In sum, neither the explicit statutory language nor the structure and purpose of the FHSA or of the CPSC regulations indicates that the federal small parts regulations were meant to govern small parts in all toys.
 
 B.
 IMPLIED PREEMPTION
 
 57
 TMA argues, in the alternative, that even if the court concludes that the Connecticut statute is not expressly preempted, we should find that the statute is impliedly preempted.
 
 
 58
 Even where Congress has not expressed an intent to pre-empt the entire field of regulation, a particular state rule will be pre-empted when it is impossible to comply with both state and federal law, Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142-43, 83 S.Ct. 1210, 1217-18, 10 L.Ed.2d 248 (1963), or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress. Hines v. Davidowitz, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941).
 
 
 59
 Cable Television Ass'n of NY, Inc. v. Finneran, 954 F.2d 91, 98 (2d Cir.1992). TMA contends that the Connecticut statute "stands as an obstacle to the accomplishment of the full purposes and objectives" of the FHSA and of the actions taken by the CPSC.
 
 
 60
 The district court found that "[s]ince the FHSA contains an express pre-emption provision, this Court's inquiry must be limited to the meaning of that provision." (Joint Appendix 69a). It held that "when provided with an express pre-emption provision, a court is foreclosed from pursuing a theory of implied pre-emption." (Joint Appendix 78a). In reaching this conclusion, the court relied primarily on the Supreme Court's recent decision in Cipollone v. Liggett Group, Inc., --- U.S. ----, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992), in which the Court held that:
 
 
 61
 When Congress has considered the issue of pre-emption and has included in the enacted legislation a provision explicitly addressing that issue, and when that provision provides a reliable indicium of congressional intent with respect to state authority, there is no need to infer congressional intent to pre-empt state laws from the substantive provisions of the legislation.
 
 
 62
 Id. at 2618 (internal quotation marks and citations omitted) (emphasis added).
 
 
 63
 It is true that where a preemption provision provides a "reliable indicium of congressional intent" a court is required to restrict its preemption analysis to the terms of that clause. However, a finding of implied preemption (which enlarges the field of preemption beyond what is covered by an express provision) is not automatically foreclosed by the existence of a preemption clause, as the district court's opinion may suggest. Cipollone specifically requires courts to determine first that the express preemption provision provides "a reliable indicium of congressional intent with respect to state authority" before it may reject implied preemption arguments.
 
 
 64
 In this case, because the FHSA's express preemption provision does provide a "reliable indicium of congressional intent with respect to state authority," we concur with the district court's conclusion that an implied preemption analysis is not appropriate in the circumstances.
 
 
 65
 It is worth noting that, even assuming an implied preemption analysis were appropriate, TMA has failed to make out such a claim. TMA argues that the regulatory history "clearly indicates that the CPSC did not intend to leave a vacuum into which the states could assert themselves." (Appellant's Brief at 16). However, as discussed above, there is no indication that the CPSC intended to create a comprehensive scheme of federal small parts regulation, and, accordingly, TMA's implied conflict preemption argument fails.
 
 
 66
 TMA's final contention that upholding the Connecticut statute "would open up a literal Pandora's Box of conflicting burdensome state regulations," (Appellant's Reply Brief at 2), does not alter our conclusion. We recognize that it may not be practical, efficient, or cost-effective for toy companies to develop warning labels in compliance with many different sets of regulations . However, that potential burden is a matter for action by Congress or the CPSC, not for the court.
 
 
 67
 In any event, national uniformity is clearly not intended under the FHSA. Congress specified, in connection with its adoption of the current FHSA preemption provision in 1976, that:
 
 
 68
 This preemption scheme is designed to meet the competing interests of those who view Federal requirements as merely minimum standards and those who would opt for uniform national requirements.
 
 
 69
 See S.Rep. No. 94-251, 94th Cong., 2d Sess. 12 (1976), reprinted in 1976 U.S.C.C.A.N. 993, 1004.
 
 CONCLUSION
 
 70
 We conclude that the small parts regulations issued pursuant to the Hazardous Substances Act--s 1500.18(a)(9) and Part 1501--do not preempt Connecticut General Statute § 21a-337, as amended by 1992 Conn.Pub.Acts No. 92-127, § 1, and 1992 Conn.Pub.Acts (May Session) No. 92-11, § 57, which requires small parts warning label requirement with respect to toys or other children's articles intended for use by children between the ages of three and seven. The judgment of the district court is affirmed.
 
 
 
 *
 Hon. Morris E. Lasker, Judge, United States District Court for the Southern District of New York, sitting by designation
 
 
 [1]
 TMA is a not-for-profit trade organization, whose members are 230 toy manufacturers and importers. Its members account for 85% of all toy sales in the United States