**ASSOCIATION OF INTERNATIONAL AUTOMOBILE MANUFACTURERS, INC. and American Automobile Manufacturers Association, Inc., Plaintiffs,**

v.

**Robert ABRAMS, as Attorney General of the State of New York and Patricia B. Adduci, as Commissioner, Department of Motor Vehicles, State of New York, Defendants.**

**No. 93 Civ. 0640 (WK).**

United States District Court, S.D. New York.

Nov. 14, 1994.

Michael Hoenig, Daniel V. Gsovski, Herzfeld & Rubin, P.C., New York City, for plaintiffs.

Marcie S. Mintz, Asst. Atty. Gen., New York State Dept. of Law, New York City, for defendants.

Judith P. Vladeck, Vladeck, Waldman, Elias & Engelhard, New York City, David C. Vladeck, Public Citizen Litigation Group, Washington, DC, for amici curiae.

### MEMORANDUM AND ORDER

WHITMAN KNAPP, Senior District Judge.

This case presents a three-pronged constitutional challenge to a recently enacted New York statute requiring automobile manufacturers to disclose to consumers information regarding bumper quality. Plaintiffs, two associations representing automobile manufacturers, move for summary judgment, asserting that the statute must be invalidated as preempted by federal law; and because it is unconstitutionally vague and impermissibly burdens interstate commerce. Defendants cross-move for summary judgment, contending that the statute suffers from no such constitutional infirmities. Three consumer advocacy organizations, Public Citizen, Inc., Consumers Union, and the Center for Auto Safety, have filed an *amici curiae* memorandum of law in support of defendants' motion. For the reasons that follow, we grant defendants' motion for summary judgment and deny that of plaintiffs.

### I.

In 1992, the state of New York enacted Section 416–a of its Vehicle and Traffic Law (hereinafter "the New York Statute" or "the Statute"), which prohibits the sale or lease within the state of any passenger car manufactured after January 1, 1993, or any offer of either such transaction, unless a "bumper quality label" providing certain information is affixed to it. The Statute, which became effective on February 3, 1993, specifies information that the label must include:

> This vehicle is equipped with a front bumper that has been tested at an impact speed of (specified by vehicle manufacturer) \_\_\_\_ miles per hour and a rear bumper that has been tested at an impact speed of (specified by vehicle manufacturer) \_\_\_\_ miles per hour, and has sustained no damage to the vehicle's body and minimal damage to the bumper and attachment hardware. Minimal damage to the bumper means damage that can be repaired with the use of common repair materials and without replacing any parts. The stronger the bumper, the less likely the car will need repair after a low speed collision.

N.Y. Vehicle and Traffic Law § 416–a(1) (McKinney's 1992). It further provides that "[t]he impact speed required to be specified in the notice * * * is the maximum speed of impact upon the bumper of the vehicle at which the vehicle sustains no damage to the body and safety systems and only minimal damage to the bumper." § 416–a(2). Violations are subject to a maximum civil fine of fifty dollars per vehicle. The Statute makes no reference to how motor vehicles should be manufactured, and imposes no requirements pertaining to their performance.

It was the legislature's expectation that the Statute would provide potential automobile purchasers with greater information about the safety and durability of passenger vehicles on the market. New York Attorney General Robert Abrams wrote a memorandum to Governor Mario Cuomo in July, 1992, urging him to approve the Statute, noting:

> The bumper quality label requirement proposed by this bill would help new car buyers to make better informed purchasing decisions, thus benefiting both safety and economic interests of consumers. Obviously, a stronger vehicle bumper will reduce the likelihood that the car will require expensive repairs after a low-speed collision. Thus, this bill could help to contain insurance costs, because the cost of repairs is factored into the determination of insurance premiums for property damage liability coverage.

(Pl.Ex. C at 2).

On August 7, 1992, Governor Cuomo approved the Statute, observing in his Memorandum of Approval:

> today's car buyers * * * [seek] to purchase a vehicle which protects passengers from injury and which incurs minimal damage in the event of an accident. This goal cannot be realized, however, unless the consumer is provided with sufficient information upon which to make an informed decision * * * This bill will greatly assist consumers in making comparisons between bumper qualities of different vehicles. With this new information, car buyers will be better able to make informed decisions regarding these important purchases.

(Pl.Ex. B at 1).

## II.

Plaintiffs argue that the Statute is both expressly and impliedly preempted under the Supremacy Clause. Article VI of the Constitution provides that the laws of the United States "shall be the supreme Law of the Land; ... any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." Ever since *McCulloch v. Maryland* (1819) 4 Wheat. 316, 427, 4 L.Ed. 579, "it has been settled that state law that conflicts with federal law is 'without effect.'"

*Cipollone v. Liggett Group, Inc.* (1992) —— U.S. ——, ——, 112 S.Ct. 2608, 2617, 120 L.Ed.2d 407 (citation omitted). However, a party asserting preemption carries a heavy burden. As observed in *Chicago & North Western Transp. Co. v. Kalo Brick & Tile Co.* (1981) 450 U.S. 311, 317, 101 S.Ct. 1124, 1130, 67 L.Ed.2d 258:

> Pre-emption of state law by federal statute or regulation is not favored "in the absence of persuasive reasons—either that the nature of the regulated subject matter permits no other conclusion, or that the Congress has unmistakably so ordained." *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142 [83 S.Ct. 1210, 1217, 10 L.Ed.2d 248] (1963).

Plaintiffs contend the Statute effectively creates a bumper testing standard at variance with the federal bumper standard and is thus expressly preempted. We reject that contention. It is true that the Statute would be preempted under federal law if it required vehicles to meet any particular performance or safety standards. However, it neither does nor attempts to do any such thing. In the alternative, plaintiffs assert that the Statute is unconstitutional as impliedly preempted. That argument is similarly unavailing.

### A. The Federal "Bumper Standard"

The regulation of automobile safety has been primarily a federal matter since the passage of two federal statutes, the National Traffic and Motor Vehicle Safety Act of 1966 ("the Safety Act"), 15 U.S.C.A. §§ 1381–1431 (1982 & Supp.1994) and the Motor Vehicle Information and Cost Savings Act of 1972 ("the Cost Savings Act"), 15 U.S.C.A. §§ 1901–2012 (1982 & Supp.1994).

Congress enacted the Safety Act in 1966 in order to increase automobile safety through the establishment of federal motor vehicle safety standards. The statute shifted "the primary responsibility for regulating the national automotive manufacturing industry" to the federal government, S.Rep. No. 1301, 89th Cong., 2d Sess. 1, reprinted in 1966, U.S.Code Cong. & Admin.News 2709, 2712, in part by authorizing the National Highway & Traffic Safety Administration ("NHTSA") to issue such safety standards. As the legis-

lative history of the Safety Act makes abundantly clear, Congress was above all concerned with establishing a minimum, uniform automobile safety standard "so that the public as well as industry will be guided by one set of criteria rather than by a multiplicity of diverse standards." H.Rep. 1776, 89th Cong., 2d Sess. 17 (1966). Thus the originally enacted Safety Act contained (and, in its present form, still contains) the following preemption provision:

> **Supremacy of federal standards;** * * *
> (d) Whenever a Federal motor vehicle safety standard established under this subchapter is in effect, no State or political subdivision of a State shall have any authority either to establish, or to continue in effect, with respect to any motor vehicle or item of motor vehicle equipment any safety standard applicable to the same aspect of performance of such vehicle or item of equipment which is not identical to the federal standard.

15 U.S.C. § 1392(d).

In 1970, NHTSA promulgated Federal Motor Vehicle Safety Standard ("FMVSS") 215, the first federal bumper standard issued under the authority of the Safety Act. In the initial Notice of Proposed Rulemaking for the bumper standard, NHTSA noted that § 1392(d) "requires any State standard dealing with the same aspect of performance as the Federal standard to be identical to the Federal standard to the extent that it regulates the same vehicles." 35 Fed.Reg. 17999, 18000 (1970).

In 1982, Congress amended § 1392(d), the Safety Act's preemption provision, to include the following additional sentence: "Nothing in this section shall be construed as preventing any State from enforcing any safety standard which is identical to a Federal safety standard." Pub.L. No. 97–331, § 3, 96 Stat. 1619 (1982). According to the Committee Reports from both the House and the Senate, this amendment was enacted in order to clarify the role of states in regulating motor vehicle safety under the Safety Act scheme:

> * * * [S]tates are not preempted from enforcing safety standards identical to Federal standards which they have adopted. States may not require certifica-

tion or approval of motor vehicles or motor vehicle equipment.

H.R.Rep. No. 576, 97th Cong., 2d Sess. 6, 7 (1982); S.Rep. No. 505, 97th Cong., 2d Sess. 5, 6 (1982), reprinted in 1982 U.S.Code Cong. & Admin.News at 3169, 3174.

In 1972 Congress explicitly authorized NHTSA's promulgation of bumper standards when it enacted the Cost Savings Act. Congress declared that the purpose of the Act was "to reduce the economic loss resulting from damage to passenger motor vehicles involved in motor vehicle accidents," 15 U.S.C.A. § 1911(a), and that Subchapter I of the Act, captioned "BUMPER STANDARDS," was intended to help achieve that end "by providing for the promulgation and enforcement of bumper standards." § 1911(b). Bumper standards promulgated under the authority of the Cost Savings Act are "applicable to all passenger motor vehicles manufactured in or imported into the United States." § 1912(a)(1). Any such vehicle must bear a label certifying that it conforms to any applicable Federal bumper standards, as of the date of manufacture. § 1915(c).

The Cost Savings Act explicitly prohibits states from establishing or enforcing bumper standards which are not identical with federal standards. Under 15 U.S.C. § 1920(a),

> no State or political subdivision thereof shall have any authority to establish or enforce with respect to any passenger motor vehicle or passenger motor vehicle equipment offered for sale any bumper standard which is not identical to a Federal bumper standard.

The current federal bumper standard is set forth at 49 C.F.R. §§ 581.1–581.7 (1993), and requires that all motor vehicles meet specified damage criteria when impacted during "longitudinal impact" and "corner impact" tests at the speeds of 1.5 miles per hour and at 2.5 miles per hour under specified conditions. The damage criteria—i.e. the condition the vehicle must be in after the tests prescribed—are listed in § 581.5(c), as follows (in relevant part):

> (c) Protective criteria. (1) Each lamp or reflective device except license plate lamps

shall be free of cracks and shall comply with applicable visibility requirements * * * The aim of each headlamp shall be adjustable to within the beam aim inspection limits specified * * * measured with a mechanical aimer * * *

(2) The vehicle's hood, trunk, and doors shall operate in the normal manner.

(3) The vehicle's fuel and cooling systems shall have no leaks or constricted fluid passages and all sealing devices and caps shall operate in the normal manner.

(4) The vehicle's exhaust system shall have no leaks or constrictions.

(5) The vehicle's propulsion, suspension, steering, and braking systems shall remain in adjustment and shall operate in the normal manner.

(6) A pressure vessel used to absorb impact energy in an exterior protection system by the accumulation of gas pressure or hydraulic pressure shall not suffer loss of gas or fluid accompanied by separation of fragments from the vessel.

(7) The vehicle shall not touch the test device, except on the impact ridge * * * with a force that exceeds 2000 pounds on the combined surfaces of Planes A and B of the test device.

(8) The exterior surfaces shall have no separations of surface materials, paint, polymeric coatings, or other covering materials from the surface to which they are bonded, and no permanent deviations from their original contours 30 minutes after completion of each pendulum and barrier impact, except where such damage occurs to the bumper face bar and the components and associated fasteners that directly attach the bumper face bar to the chassis frame.

(9) Except as provided in § 581.5(c)(8), there shall be no breakage or release of fasteners or joints.

### B. Express Preemption

■ As noted above, the Safety Act expressly preempts states from establishing "any safety standard applicable to the same aspect of performance of such vehicle or item of equipment which is not identical to the federal standard." The Cost Savings Act prohibits states from establishing and enforcing "any bumper standard which is not identical to a Federal bumper standard." As the New York Statute imposes neither type of standard it is not expressly preempted under either Act.

The Safety Act defines the term "motor vehicle safety standards" as follows (at 15 U.S.C.A. § 1391(2)):

> a minimum standard for motor vehicle performance, or motor vehicle equipment performance, which is practicable, which meets the need for motor vehicle safety, and which provides objective criteria.

The Cost Savings Act defines the term "bumper standard" as follows (at 15 U.S.C.A. § 1901(6)):

> any property loss reduction standard the purpose of which is (A) to eliminate or reduce substantially physical damage to the front or rear ends (or both) of a passenger motor vehicle resulting from (i) a low-speed collision * * * or (ii) from the towing of such vehicle, or (B) to reduce substantially the cost of repair of the front or rear ends (or both) of such vehicle when damaged (i) in such a collision or (ii) as a result of being towed; * * *

Under the Act, "property loss reduction standard" means

> a minimum performance standard established for the purpose of increasing the resistance of passenger motor vehicles * * * to damage resulting from motor vehicle accidents or for the purpose of reducing the cost of repairing such vehicles * * * damaged as a result of such accidents.

§ 1901(5).

The New York Statute in no way concerns itself with these federal definitions. It identifies neither a "minimum standard for motor vehicle performance," § 1391(2), nor a "minimum performance standard," § 1901(5), but instead requires car manufacturers to disclose to consumers the maximum speed at which a vehicle's front and rear bumpers can be impacted and "sustain[ ] no damage to the vehicle's body and minimal damage to the

bumper and attachment hardware." Although it is quite probable that, as a result of the Statute, manufacturers will attempt to establish performance of bumpers on their vehicles about which they can boast, such activity would result from nothing more than the demands of the marketplace.[1]

### C. Implied Preemption

Plaintiffs offer two arguments in support of their implied preemption claim. They first assert that the New York Statute creates "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941). Further, they contend that the Safety and Cost Savings Acts and regulations promulgated under their authority are "sufficiently comprehensive" with regard to the regulation and certification of bumper performance "to make reasonable the inference that Congress 'left no room' for supplementary state regulation." *Hillsborough County v. Automated Medical Lab., Inc.* (1985) 471 U.S. 707, 713, 105 S.Ct. 2371, 2375, 85 L.Ed.2d 714 *quoting Rice v. Santa Fe Elevator Corp.* (1947) 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447.

However, the Supreme Court has recently placed limits on the discretion of lower courts to entertain implied preemption claims such as these. In *Cipollone v. Liggett Group, Inc.* (1992) —— U.S. ——, ——, 112 S.Ct. 2608, 2618, 120 L.Ed.2d 407 the Court held:

> When Congress has considered the issue of pre-emption and has included in the enacted legislation a provision explicitly addressing that issue, and when that provision provides a reliable indicium of con-

gressional intent with respect to state authority, there is no need to infer congressional intent to pre-empt state laws from the substantive provisions of the legislation [internal quotation marks and citations omitted].

The Second Circuit, in *Toy Mfrs. of America, Inc. v. Blumenthal* (2d Cir.1992) 986 F.2d 615, 623–24, clarified that holding (emphasis in original):

> It is true that where a preemption provision provides a "reliable indicium of congressional intent" a court is required to restrict its preemption analysis to the terms of that clause. However, a finding of implied preemption (which enlarges a field of preemption beyond what is covered by an express provision) is not *automatically* foreclosed by the existence of a preemption clause * * *

■ We find that the Congressional intent expressed in the preemption provisions of the Safety and Cost Savings Acts is unambiguous. Therefore, under the just cited cases, we need not determine whether the New York Statute is impliedly preempted.

■ However, we specifically note that NHTSA's 1990 denial of a petition from *amicus* Consumers Union requesting the issuance of regulations requiring automobile dealers to disclose information concerning the repair costs for damages sustained in low-speed crashes in no way suggests preemption. *See* 55 Fed.Reg. 24284 (June 15, 1990). In denying a special interest group's request for specific action, the agency never indicated that it intended to preclude the enactment of state bumper disclosure laws such as the Statute we here review. The

---

1. As the *amici* memorandum points out, Am. Mem. at 11–12, a brief consideration of the structure of—and some of the provisions within—the Cost Savings Act confirms that Congress intended that its preemptive scope be limited and focused.

The Act clearly treats types of federal regulation other than preemptive "standards." Title II of the Act, entitled, "Automobile Consumer Information Study," 15 U.S.C. §§ 1941–9, addresses information disclosure rules. It authorizes NHTSA to investigate the methods used in determining the "damage susceptibility," the "degree of crashworthiness" and the "characteristics of such vehicles with respect to the ease of diagno-

sis and repair ..." and to make recommendations based on its investigation. 15 U.S.C. § 1941(a). It also empowers NHTSA to *"by rule* require automobile dealers to distribute to prospective purchasers any information compiled pursuant to this subsection." § 1941(d) (emphasis supplied).

Although NHTSA has considered requiring the disclosure of information relating to the cost of remedying damage sustained in low impact crashes, it has never done so. *See, e.g.,* 55 Fed. Reg. 24284 (June 15, 1990). This agency inaction is briefly discussed in Sec. II, Part C of our opinion, which addresses plaintiffs' implied preemption arguments.

record here fails to demonstrate that the agency "manifested an intention to shut out state action" or to "assert exclusive control over" bumper performance disclosure. *Toy Mfrs.*, 986 F.2d at 623. The relevant evidence before us indicates that the denial of the Consumer Union petition signified nothing more than NHTSA's lack of interest in itself instituting and enforcing a low-speed crash disclosure requirement.

## III.

Plaintiffs have also asserted that the Statute is unconstitutionally vague. To the contrary, we find it to be an illustration of legislative clarity.

The Due Process Clause of the Fourteenth Amendment requires that state laws "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly ... [and] must provide explicit standards for those who apply them." *Grayned v. City of Rockford* (1972) 408 U.S. 104, 108, 92 S.Ct. 2294, 2298–99, 33 L.Ed.2d 222. The void for vagueness doctrine aims to prevent laws from "trap[ping] the innocent by not providing fair warning," and to insure that law enforcement officers, judges and juries are not delegated public policy decisions which they might resolve "on an ad hoc and subjective basis...." *Id.* at 108–109, 92 S.Ct. at 2299.

Here plaintiff makes three specific assertions about the bumper Statute's alleged vagueness. First, plaintiffs contend that the Statute "fails to specify in any manner the speeds at which testing is to be conducted." Pl.Mem. at 36. Plaintiffs further insist that it fails to define two essential components of what they refer to as the statute's "damage resistance criteria"—"common repair materials" and "safety systems"—with the result that "persons 'of common intelligence,' and indeed even qualified expert professionals, cannot devise a test procedure or evaluate its outcome under the New York statute except by guesswork." Pl.Mem. at 37.

The level of scrutiny to be employed in vagueness analysis turns upon a number of factors relating to the particular statute or ordinance at issue. *See, e.g., Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.* (1982) 455 U.S. 489, 498–99, 102 S.Ct. 1186, 1193–94, 71 L.Ed.2d 362. In *Flipside,* the Court summarized this multi-factor approach—as applied to civil laws such as the New York Statute—as follows:

> [E]conomic regulation is subject to a less strict vagueness test because its subject matter is often more narrow, and because, businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action. Indeed, the regulated enterprise may have the ability to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process. The Court has also expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe. And the Court has recognized that a scienter requirement may mitigate a law's vagueness * * *
>
> Finally, perhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights. [Footnotes omitted].

*Id.* at 498, 102 S.Ct. at 1193. In reviewing the civil ordinance before it, the *Flipside* Court further noted that because it "nominally impose[d] only civil penalties" but was "quasi-criminal," "its prohibitory and stigmatizing effect may warrant a relatively strict test." *Id.* at 499, 102 S.Ct. at 1194.

Plaintiffs contend that the Statute is "quasi-criminal" in nature and should therefore be subjected to heightened constitutional scrutiny. Assuming such standard to apply, we find that no rational person would be confused by the provision that "minimal damage to the bumper means damage that can be repaired with the use of common repair materials and without replacing any spare parts." It would also seem to us that "safety systems" simply means anything in the vehicle's mechanism designed to increase the safety of its operations. After all, the word "safety" is neither esoteric nor uncommonly used.

■ Plaintiffs' concern with the Statute's failure to specify the speeds at which they must test their vehicles is similarly unfounded. The Statute requires the manufacturer to disclose "the maximum speed of impact * * * at which the vehicle sustains no damage to the body and safety systems and only minimal damage to the bumper." In light of the purpose of the Statute—to enhance consumer knowledge—it is obvious to us that the legislature intended each manufacturer to determine for itself what maximum to claim to be safe and then to hold it responsible should it turn out that it overstated that speed.

### IV.

■ Plaintiffs' final contention is that the Statute impermissibly burdens interstate commerce in violation of the "dormant" Commerce Clause.[2] Where, as here, a state statute is challenged as unconstitutional under the dormant Commerce Clause but is not alleged to have a discriminatory impact upon interstate commerce, we must determine whether "the burden imposed on such commerce is *clearly excessive* in relation to the putative local benefits" of the statute. *Pike v. Bruce Church, Inc.* (1970) 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (emphasis supplied).

Plaintiffs point to three ways in which the Statute burdens interstate commerce: (1) that manufacturers who supply vehicles to dealers both outside and inside New York will be penalized when—as is inevitable—vehicles initially ordered by dealers outside New York (and thus not bearing the required bumper label) are later sold or leased in New York; (2) that because it requires extensive and expensive testing, it may influence the design of cars sold throughout the nation; and (3) that it may affect motor vehicle regulation in other states by encouraging those states to adopt bumper disclosure laws with different bumper standards and that this would have a disastrous effect upon the interstate automobile industry.

None of these alleged effects create any "excessive burden." Plaintiffs have not—and cannot—make a showing that any hardship results from requiring manufacturers to remove or apply the labels required under the Statute when cars are leased or sold in a different state from that for which they were originally ordered. Plaintiffs' second and third hardship arguments are similarly unavailing. The Statute does not require motor vehicles to meet any *design* requirements at all; nor, as we have above observed, has it created any standards which might conflict in the future with similar laws enacted by other states. In brief, plaintiffs' commerce clause claim suffers from the same infirmity as their preemption claim: It fails to recognize that the Statute does not create performance standards for bumpers but simply requires manufacturers to inform consumers about the bumper performance of their vehicles. Any action taken by manufacturers to present consumers with more attractive figures about such performance cannot be attributed to the Statute, but only to the very nature of competition.

### CONCLUSION

For the reasons discussed above, we grant defendants' motion for summary judgment.

SO ORDERED.

---

**2.** The Commerce Clause provides in relevant part that "Congress shall have Power ... to regulate Commerce ... among the several States ..." U.S. Const., Art. I, sec. 8, cl. 3. The Supreme Court has long held that the Clause implicitly limits the authority of States to regulate interstate commerce. *See, e.g., H.P. Hood & Sons v. Du Mond* (1949) 336 U.S. 525, 534–35, 69 S.Ct. 657, 663, 93 L.Ed. 865; *Quill Corp. v. N. Dakota* (1992) —— U.S. ——, ——, 112 S.Ct. 1904, 1911, 119 L.Ed.2d 91.