84 F.3d 602
 ASSOCIATION OF INTERNATIONAL AUTOMOBILE MANUFACTURERS, INC.,
and American Automobile Manufacturers Association,
Plaintiffs-Appellants,
v.
Robert ABRAMS, as Attorney General of the State of New York,
and Patricia B. Adduci, as Commissioner,
Department of Motor Vehicles,
Defendants-Appellees.
 No. 710, Docket 94-9306.
 United States Court of Appeals,
Second Circuit.
 Argued Dec. 20, 1995.
Decided May 23, 1996.
 
 Kenneth W. Starr, Washington, DC (Paul T. Cappuccio, Kirkland & Ellis, Washington, DC, Michael Hoenig, Daniel V. Gsovski, Herzfeld & Rubin, New York City, Richard A. Cordray, Grove City, Ohio, on the brief), for Plaintiffs-Appellants.
 Rosalie J. Hronsky, Assistant Attorney General, New York City (Dennis C. Vacco, Attorney General of the State of New York, New York City, on the brief), for Defendants-Appellees.
 Public Citizen Litigation Group, Washington, DC (David C. Vladeck, Washington, DC, of counsel), for Amici Curiae Public Citizen, Inc., Consumers Union of United States, The Center for Auto Safety, and New York Public Interest Research Group in support of Appellees.
 Before: KEARSE, MAHONEY, and PARKER, Circuit Judges.
 KEARSE, Circuit Judge:
 
 
 1
 Plaintiffs Association of International Automobile Manufacturers, Inc., and American Automobile Manufacturers Association (collectively "AIA") appeal from a final judgment of the United States District Court for the Southern District of New York, Whitman Knapp, Judge, dismissing their complaint against officials of the State of New York ("State"), challenging the validity of § 416-a of the New York Vehicle and Traffic Law (McKinney 1986 & Supp.1995), which, inter alia, requires automobile manufacturers to affix to each new passenger vehicle a label stating the maximum speed at which the vehicle's bumpers suffer only minimal damage upon impact ("New York bumper statute" or "New York statute"). AIA contended that the New York bumper statute is preempted by federal law, that it burdens interstate commerce in violation of the Commerce Clause of the Constitution, and that it is so vague as to violate the Due Process Clause. The district court rejected these contentions and granted summary judgment in favor of defendants. AIA pursues its contentions on appeal. For the reasons that follow, we conclude that there are genuine issues of fact as to the preemption and Commerce Clause claims and that summary judgment dismissing those claims was inappropriate. Accordingly, we vacate and remand for further proceedings.
 
 I. BACKGROUND
 
 2
 The present action centers principally on the requirements imposed on passenger vehicle manufacturers by the New York bumper statute, in comparison to those imposed by federal law as reflected in two statutes, to wit, the National Traffic and Motor Vehicle Safety Act of 1966 (the "Safety Act"), 49 U.S.C.A. §§ 30101-30169 (West 1995), and the Motor Vehicle Information and Cost Savings Act of 1972 (the "Cost Savings Act"), 49 U.S.C.A. §§ 32101-33118 (West 1995) (collectively "the federal Acts"), with respect to damage sustained by the vehicle's bumpers in a simulated collision.
 
 
 3
 The New York bumper statute, enacted in 1992, prohibits, inter alia, the sale or lease of any new passenger vehicle unless there is affixed to the vehicle a "bumper quality label" that states as follows:
 
 
 4
 This vehicle is equipped with a front bumper that has been tested at an impact speed of (specified by vehicle manufacturer) _____ miles per hour and a rear bumper that has been tested at an impact speed of (specified by the vehicle manufacturer) _____ miles per hour, and has sustained no damage to the vehicle's body and minimal damage to the bumper and attachment hardware. Minimal damage to the bumper means damage that can be repaired with the use of a [sic ] common repair materials and without replacing any parts. The stronger the bumper, the less likely the car will require repair after a low-speed collision.
 
 
 5
 N.Y. Vehicle & Traffic Law § 416-a(1) (emphasis added). "[I]mpact speed" is defined as
 
 
 6
 the maximum speed of impact upon the bumper of the vehicle at which the vehicle sustains no damage to the body and safety systems and only minimal damage to the bumper when subjected to the fixed barrier and pendulum impact tests, and when subjected to the corner impact test at not less than sixty percent of that maximum speed, conducted pursuant to the practices, procedures and regulations promulgated under the concurrent authority of the [Safety Act and the Cost Savings Act.]
 
 
 7
 Id. § 416-a(2) (emphases added). Violation of these provisions subjects a manufacturer to a civil fine of up to $50 per vehicle. Id. § 416-a(4).
 
 
 8
 As discussed in greater detail in Part II.A. below, the Safety Act and Cost Savings Act require the Secretary of Transportation ("Secretary") to promulgate standards regarding the safety, performance, and cost to insure passenger vehicles. The federal Acts also provide that state law is preempted to the extent that it is not identical to certain standards set by the federal Acts.
 
 
 9
 On the day before the New York bumper statute was to become effective, AIA commenced the present action, alleging that the New York statute is constitutionally invalid on the grounds (1) that it imposes on manufacturers standards that are inconsistent with those imposed by the Safety Act and the Cost Savings Act, and hence is expressly and impliedly preempted by the federal Acts; (2) that it impermissibly burdens interstate commerce because (a) manufacturers will be penalized under the statute when vehicles initially ordered by dealers outside of New York are later sold or leased in New York, (b) the need for extensive and expensive testing may influence the design of cars sold nationally, and, (c) other states may be prompted to adopt their own disclosure laws and create a disuniformity of regulation; and, (3) that the statute is impermissibly vague in that it (a) fails to specify the speeds at which testing must be conducted and (b) fails to define the terms "safety systems" and "common repair materials." The State deferred enforcement of the statute during the pendency of this suit in the district court. Both sides moved for summary judgment.
 
 
 10
 In an opinion reported at 867 F.Supp. 248 (1994), the district court rejected all of AIA's contentions and granted summary judgment in favor of the State. The court rejected the claim of express preemption on the ground that the New York bumper statute requires only information disclosure and that the federal Acts' express preemption provisions cover not disclosure but rather standards of performance:
 
 
 11
 The New York Statute in no way concerns itself with these federal definitions. It identifies neither a minimum standard for motor vehicle performance, nor a minimum performance standard, but instead requires car manufacturers to disclose to consumers the maximum speed at which a vehicle's front and rear bumpers can be impacted and "sustain[ ] no damage to the vehicle's body and minimal damage to the bumper and attachment hardware." Although it is quite probable that, as a result of the Statute, manufacturers will attempt to establish performance of bumpers on their vehicles about which they can boast, such activity would result from nothing more than the demands of the marketplace.
 
 
 12
 867 F.Supp. at 253-54 (quoting New York statute; other internal quotation marks omitted). The court rejected AIA's implied preemption claim, noting that judicial discretion to consider such a claim is limited:
 
 
 13
 [T]he Supreme Court has recently placed limits on the discretion of lower courts to entertain implied preemption claims.... In Cipollone v. Liggett Group, Inc. (1992) [505 U.S. 504, 517], 112 S.Ct. 2608, 2618, 120 L.Ed.2d 407 the Court held:
 
 
 14
 When Congress has considered the issue of pre-emption and has included in the enacted legislation a provision explicitly addressing that issue, and when that provision provides a reliable indicium of congressional intent with respect to state authority, there is no need to infer congressional intent to pre-empt state laws from the substantive provisions of the legislation.... [Internal citation and quotation marks omitted by district court.]
 
 
 15
 The Second Circuit, in Toy Mfrs. of America, Inc. v. Blumenthal (2d Cir.1992) 986 F.2d 615, 623-24, clarified that holding (emphasis in original):
 
 
 16
 It is true that where a preemption provision provides a "reliable indicium of congressional intent" a court is required to restrict its preemption analysis to the terms of that clause. However, a finding of implied preemption (which enlarges a field of preemption beyond what is covered by an express provision) is not automatically foreclosed by the existence of a preemption clause....
 
 
 17
 867 F.Supp. at 254. The court found that the "Congressional intent expressed in the preemption provisions of the [federal Acts] is unambiguous" and stated that "[it] need not determine whether the New York Statute is impliedly preempted." Id.
 
 
 18
 The court also rejected AIA's claim that the New York statute impermissibly burdens interstate commerce, finding no evidence that manufacturers would suffer any hardship from the statute's requirements as to labeling. It stated that any impetus for manufacturers to change their vehicle designs would come only from the nature of competition, for the statute itself imposes no design requirements:
 
 
 19
 None of [AIA's] alleged effects create any "excessive burden." Plaintiffs have not--and cannot--make a showing that any hardship results from requiring manufacturers to remove or apply the labels required under the Statute when cars are leased or sold in a different state from that for which they were originally ordered. Plaintiffs' second and third hardship arguments are similarly unavailing. The Statute does not require motor vehicles to meet any design requirements at all; nor ... has it created any standards which might conflict in the future with similar laws enacted by other states. In brief, plaintiffs' commerce clause claim suffers from the same infirmity as their preemption claim: It fails to recognize that the Statute does not create performance standards for bumpers but simply requires manufacturers to inform consumers about the bumper performance of their vehicles. Any action taken by manufacturers to present consumers with more attractive figures about such performance cannot be attributed to the Statute, but only to the very nature of competition.
 
 
 20
 Id. at 256 (emphasis in original).
 
 
 21
 The district court rejected AIA's claim that the New York statute is impermissibly vague, finding the meanings of the challenged terms facially quite clear:
 
 
 22
 [W]e find that no rational person would be confused by the provision that "minimal damage to the bumper means damage that can be repaired with the use of [sic ] common repair materials and without replacing any spare [sic ] parts." It would also seem to us that "safety systems" simply means anything in the vehicle's mechanism designed to increase the safety of its operations. After all, the word "safety" is neither esoteric nor uncommonly used.
 
 
 23
 Plaintiffs' concern with the Statute's failure to specify the speeds at which they must test their vehicles is similarly unfounded. The Statute requires the manufacturer to disclose "the maximum speed of impact ... at which the vehicle sustains no damage to the body and safety systems and only minimal damage to the bumper." In light of the purpose of the Statute--to enhance consumer knowledge--it is obvious to us that the legislature intended each manufacturer to determine for itself what maximum to claim to be safe and then to hold it responsible should it turn out that it overstated that speed.
 
 
 24
 Id. at 255-56. The district court concluded that the challenged portions of the New York statute are "an illustration of legislative clarity." Id. at 255.
 
 
 25
 This appeal followed.
 
 II. DISCUSSION
 
 26
 On appeal, AIA pursues its preemption, Commerce Clause, and due process contentions. We conclude that further proceedings are required with respect to the claims that the New York statute is preempted and imposes an undue burden on commerce.
 
 A. Preemption
 
 27
 Whenever the federal government has the authority to regulate a given area, Congress may exercise that power so as to preclude states from asserting authority over the same subject matter. See generally L. Tribe, American Constitutional Law § 6-25 (1988). "[T]he Supremacy Clause, U.S. Const., Art. VI, cl. 2, invalidates state laws that 'interfere with, or are contrary to,' federal law." Hillsborough County v. Automated Medical Laboratories, Inc., 471 U.S. 707, 712, 105 S.Ct. 2371, 2375, 85 L.Ed.2d 714 (1985) (quoting Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 211, 6 L.Ed. 23 (1824)); National Fuel Gas Supply Corp. v. Public Service Commission of the State of New York, 894 F.2d 571, 575-76 (2d Cir.), cert. denied, 497 U.S. 1004, 110 S.Ct. 3240, 111 L.Ed.2d 750 (1990). Such preemption may be express or implied.
 
 
 28
 Express preemption occurs to the extent that a federal statute expressly directs that state law be ousted to some degree from a certain field. See, e.g., Jones v. Rath Packing Co., 430 U.S. 519, 525, 97 S.Ct. 1305, 1309-10, 51 L.Ed.2d 604 (1977); Motor Vehicle Manufacturers Association of the United States, Inc. v. Abrams, 899 F.2d 1315, 1318-19 (2d Cir.1990), cert. denied, 499 U.S. 912, 111 S.Ct. 1122, 113 L.Ed.2d 230 (1991). Where there is such an express clause defining a law's preemptive reach, application of the interpretive principle of expressio unius est exclusio alterius may warrant the conclusion that Congress did not intend to preempt matters beyond the clause's explicit scope. Where an express clause is a reliable indicium of congressional intent, preemption is restricted to the terms of that provision. See Vango Media, Inc. v. City of New York, 34 F.3d 68, 72 (2d Cir.1994); Toy Manufacturers of America, Inc. v. Blumenthal, 986 F.2d 615, 623-24 (2d Cir.1993).
 
 
 29
 Even where there is no express statutory statement ousting state law from a given area, there may be implied preemption.
 
 
 30
 [A] federal statute implicitly overrides state law either when the scope of a statute indicates that Congress intended federal law to occupy a field exclusively, ... or when state law is in actual conflict with federal law. We have found implied conflict pre-emption where it is impossible for a private party to comply with both state and federal requirements, ... or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.
 
 
 31
 Freightliner Corp. v. Myrick, --- U.S. ----, ----, 115 S.Ct. 1483, 1487, 131 L.Ed.2d 385 (1995) (internal quotation marks omitted); see, e.g., Campbell v. Hussey, 368 U.S. 297, 300-02, 82 S.Ct. 327, 328-30, 7 L.Ed.2d 299 (1961) (field preemption); Michigan Canners & Freezers Association v. Agricultural Marketing & Bargaining Board, 467 U.S. 461, 469, 104 S.Ct. 2518, 2522-23, 81 L.Ed.2d 399 (1984) (conflict preemption); Hines v. Davidowitz, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941) (obstacle preemption). In Freightliner Corp. v. Myrick, decided after the district court's opinion herein, the Supreme Court noted that the inclusion in a federal statute of an express provision regarding preemption does not necessarily foreclose the possibility that aspects of a state law not expressly within the federal preemption provision may be preempted by implication. See --- U.S. at ---- - ----, 115 S.Ct. at 1487-88 (discussing Cipollone v. Liggett Group, Inc., 505 U.S. 504, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992)).
 
 
 32
 In the present case, we conclude that summary judgment was inappropriate with respect to AIA's claims of preemption. The Safety Act provides that the Secretary is to promulgate "motor vehicle safety standards", 49 U.S.C. § 30111(a), which is defined as a "minimum standard for motor vehicle or motor vehicle equipment performance," 49 U.S.C. § 30102(a)(9), designed to "protect[ ] the public against unreasonable risk of accidents occurring because of the design, construction, or performance of a motor vehicle, and against unreasonable risk of death or injury in an accident," id. § 30102(a)(8). The stated purpose of the Cost Savings Act is to "reduce economic loss resulting from damage to passenger motor vehicles involved in motor vehicle accidents by providing for the maintenance and enforcement of bumper standards." Id. § 32501. Under the concurrent authority of these two statutes, the National Highway Traffic Safety Administration ("NHTSA") is empowered to prescribe standards of vehicle performance and to require disclosure of vehicle information. See, e.g., 49 C.F.R. §§ 1.50(a) and (f) (authority of Secretary delegated to NHTSA). NHTSA is to seek to achieve the economic objectives of the Cost Savings Act without sacrificing the Safety Act's safety objectives. See 49 U.S.C. § 32502(b)(1).
 
 
 33
 Consistent with the Cost Savings Act's stated purpose of reducing economic loss resulting from collision damage to passenger vehicles "by providing for the maintenance and enforcement of bumper standards," 49 U.S.C. § 32501, NHTSA is to formulate "bumper standards," with the goal of obtaining the "maximum feasible reduction of costs to the public," id. § 32502(d). "[B]umper standard" is defined as
 
 
 34
 (1) ... a minimum performance standard that substantially reduces--
 
 
 35
 (A) the damage to the front or rear end of a passenger motor vehicle from a low-speed collision ... or from towing the vehicle; or
 
 
 36
 (B) the cost of repairing the damage.
 
 
 37
 Id. §§ 32101(1)(A) and (B). Accordingly, NHTSA promulgated a standard for bumper performance, see 49 C.F.R. §§ 581.1 to 581.7 (the "Part 581 Bumper Standard" or "federal standard"), which provides, inter alia, as follows:
 
 
 38
 (a) Each vehicle shall meet the damage criteria of §§ 581.5(c)(1) through 581.5(c)(9) when impacted by a pendulum-type test device in accordance with the procedures of § 581.7(b), under the conditions of § 581.6, at an impact speed of 1.5 m.p.h., and when impacted by a pendulum-type test device in accordance with the procedures of § 581.7(a) at 2.5 m.p.h., followed by an impact into a fixed collision barrier that is perpendicular to the line of travel of the vehicle, while traveling longitudinally forward, then longitudinally rearward, under the conditions of § 581.6, at 2.5 m.p.h.
 
 
 39
 49 C.F.R. § 581.5(a). The "damage criteria" set out in 49 C.F.R. §§ 581.5(c)(1) through 581.5(c)(6) provide that after the impact test the following automotive parts must essentially remain intact and operational: (1) lamps and reflective devices, (2) hood, trunk, and doors, (3) fuel and cooling systems, (4) exhaust system, (5) propulsion, suspension, steering, and braking systems, and (6) impact absorption systems. Section 581.5(c)(7) limits the force with which the tested vehicle may touch the test device. The two remaining "damage criteria" referred to in § 581.5(c) provide as follows:
 
 
 40
 (8) The exterior surfaces shall have no separations of surface materials, paint, polymeric coatings, or other covering materials from the surface to which they are bonded, and no permanent deviations from their original contours 30 minutes after completion of each pendulum and barrier impact, except where such damage occurs to the bumper face bar and the components and associated fasteners that directly attach the bumper face bar to the chassis frame.
 
 
 41
 (9) Except as provided in § 581.5(c)(8), there shall be no breakage or release of fasteners or joints.
 
 
 42
 49 C.F.R. §§ 581.5(c)(8) and (9) (emphasis added).
 
 
 43
 Both the Safety Act and the Cost Savings Act contain preemption provisions. The Safety Act provides that:.... (1) When a motor vehicle safety standard is in effect under this chapter, ... a State may prescribe or continue in effect a standard applicable to the same aspect of performance of a motor vehicle or motor vehicle equipment only if the standard is identical to the standard prescribed under this chapter....
 
 
 44
 (2) A State may enforce a standard that is identical to a standard prescribed under this chapter.
 
 
 45
 49 U.S.C. §§ 30103(b)(1) and (2). The Cost Saving Act's counterpart similarly provides that "a State may prescribe or enforce a bumper standard ... only if the standard is identical to a standard prescribed under section 32502 of this title." Id. § 32511(a). Since the Part 581 Bumper Standard is, at least in part, both a "motor vehicle safety standard" within the meaning of the Safety Act and a "bumper standard" within the meaning of the Cost Savings Act, see generally, Center for Auto Safety v. Peck, 751 F.2d 1336 (D.C.Cir.1985) (Scalia, J.), it falls within the coverage of both federal Acts' preemption provisions.
 
 
 46
 Comparing the New York bumper statute against these federal regulations, we conclude that there is at least an issue of fact as to whether the requirements imposed by the former are identical to those imposed by the latter. As to bumpers, the federal standard requires only that a bumper be sturdy enough that, when tested as specified in the federal regulation at impact speeds of 1.5 m.p.h. and 2.5 m.p.h., no appreciable damage is sustained by parts of the vehicle other than the bumper fasteners and bumpers. The express exception stated in 49 C.F.R. §§ 581.5(8) and (9) for "such damage [as] occurs to the bumper" plainly exempts bumpers from the federal damage limitation. In sum, under the federal standard the interests of safety and cost-control are considered properly balanced if, in a low-speed collision, all appreciable damage to the car is sustained by the bumper; it is permissible for the bumper itself to be destroyed.
 
 
 47
 The New York bumper statute, on the other hand, appears to require that at some unspecified impact speed the bumper itself must suffer no more than minimal damage. That statute requires the manufacturer to state that "at an impact speed of (specified by vehicle manufacturer) _____ miles per hour, [the vehicle] has sustained ... minimal damage to the bumper...." N.Y. Vehicle & Traffic Law § 416-a(1). Though the State has at times suggested that this imposes no substantive performance burden on the manufacturer because the manufacturer can simply fill in "zero," that rationale is belied by the language of the statute itself. If the "speed" were zero, movement would be nonexistent and there could not be any "impact." Thus, the very term "impact speed" is meaningless at a "speed" of zero.
 
 
 48
 Further, the New York statute itself defines "impact speed" as the "maximum speed" at which the bumper suffers minimal damage. Id. § 416-a(2) (emphasis added). We doubt that it could be said as a matter of fact, and it certainly could not be said as a matter of law, that there is no speed, however slow, at which a bumper can be impacted and suffer minimal damage. The statute thus appears to impose on the manufacturer an obligation to provide a bumper that resists more than minimal damage at some speed.
 
 
 49
 AIA's contention that the New York statute was intended to impose the substantive requirement that a car's bumper be able to withstand impact with only minimal damage at some speed greater than zero is supported by, inter alia, a preenactment letter from the State's Attorney General to its Governor, urging the Governor to approve the legislation. Though the Attorney General stated that "[t]he proposed [statute] would not require auto manufacturers to install stronger bumpers on their new cars," he plainly did not imply that a manufacturer could enter "zero" on the required label, as he stated that the new law would require disclosure of, inter alia, "the speed at which a car's bumpers can sustain a low speed collision with minimal damage to the bumpers." (Memorandum of the Attorney General to the Governor, July 16, 1992, at 1 ("Attorney General's Memorandum") (emphasis added).)
 
 
 50
 AIA's contention is further supported by a postenactment statement by New York's Department of Motor Vehicles which, in proposing State regulations implementing the New York bumper statute, noted expressly that the New York statute "is inconsistent with the federal regulation" because the New York statute requires that testing must result in no more than minimal damage to the bumper:
 
 
 51
 The proposed [New York] regulation is consistent with the [New York] statute but the [New York] statute is inconsistent with the federal regulation. Under the federal system, the bumper and attachment hardware may be damaged or destroyed in the testing but the vehicle passes if the vehicle body and safety equipment (such as lights) are not damaged. The [New York] statute does not allow for this type of damage.
 
 
 52
 Department of Motor Vehicles, Emergency/Proposed Rulemaking, New York State Register at 11 (January 27, 1993) (emphasis added).
 
 
 53
 In addition to apparently requiring that there be some speed at which the impacted bumper sustains only minimal damage, the New York statute plainly imposes the requirement that the maximum speed at which that is true be tested. The mandated label expressly refers to a front or rear "bumper that has been tested." N.Y. Vehicle & Traffic Law § 416-a(1). And whether or not the bumper sustained more than minimal damage when tested at 2.5 m.p.h., i.e., the top testing speed required by the federal regulation, the terms of the New York statute would appear to require further testing, for the manufacturer would not yet have determined what is the "maximum" speed at which the bumper suffers only minimal damage. Further, though the district court viewed the New York statute as merely meaning to "hold [a manufacturer] responsible should it turn out that it overstated that speed," 867 F.Supp. at 256 (emphasis added), there is evidence that the State intended that a manufacturer also not understate the maximum speed by simply filling in on the label the top federal testing speed. New York's Governor, in approving the statute, stated that one of its goals was to help consumers, with respect to "the quality of a vehicle's bumper[,] ... to determine to what extent vehicles exceed th[e] minimal [federal] requirement." (Governor's Memorandum Filed with Assembly Bill Number 6212-A, August 7, 1992, at 1 (emphasis added).) Plainly the Governor envisioned tests in addition to those required by federal law.
 
 
 54
 After passage of its statute, the State obtained an opinion from NHTSA's Acting Chief Counsel that the statute imposes no performance requirement for bumpers:
 
 
 55
 The New York statute does not specify any minimum performance requirements for bumpers. Rather, it requires auto manufacturers to attach a label containing information about how their bumpers performed when tested in a particular manner. Thus, the New York statute neither establishes nor enforces a "bumper standard" within the meaning of the Cost Savings Act or a "motor vehicle safety standard" within the meaning of the Safety Act. Therefore, in our view, that statute is not expressly preempted by either [of the Acts' express preemption clauses].
 
 
 56
 (Letter of John Womack, Acting Chief Counsel of NHTSA, to Congressman Charles E. Schumer, March 8, 1994, at 2.) That opinion is in conflict with the 1992 statements by the Attorney General and the Governor and with the 1993 analysis by the Department of Motor Vehicles, all of which reveal that the State meant to require some minimum standard of performance.
 
 
 57
 We also note that at the oral argument of this appeal, the Assistant Attorney General, though arguing that a manufacturer could insert "zero" as the maximum speed at which a bumper suffers no more than minimal damage, made statements as to what the State would "permit" which seemingly contradicted the zero-maximum notion. She stated, inter alia:
 
 
 58
 [w]e're not going to be arbitrary, ... we're going to allow incremental testing that--if it fails at .5 or 1, and they don't want to do any more testing, we'll try to be reasonable about the increments that we'll permit.
 
 
 59
 ....
 
 
 60
 They can test at whatever increments they want to test at or we think they need to test at....
 
 
 61
 ....
 
 
 62
 ... [i]f they test at reasonable increments, in an enforcement challenge--where--we would permit--we're not going to say you have to test at every single increment; we would permit them some latitude and try to be reasonable. If they came to us and said that they tested at .5, ... we would permit that.
 
 
 63
 In sum, though the New York statute does not state a specific minimum performance requirement, it seems quite likely that some minimum level of performance is required. Thus, the statute appears to require that cars sold in New York must be capable of suffering no more than minimal damage at some speed, whereas the federal Acts permit more than minimal damage to the bumpers so long as other parts do not sustain damage. With the record viewed in this light, it is difficult not to conclude that the New York statute creates a bumper standard that is preempted by the federal Acts. Summary judgment in favor of the State was plainly inappropriate.
 
 
 64
 This does not, however, lead us to the conclusion that, on the present record, summary judgment should have been granted in favor of plaintiffs. The fact that both sides have moved for summary judgment does not necessarily mean that summary judgment may properly be granted for either side. See, e.g., Eastman Machine Co. v. United States, 841 F.2d 469, 473 (2d Cir.1988). "Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." Schwabenbauer v. Board of Education, 667 F.2d 305, 314 (2d Cir.1981); see also Abrams v. United States, 797 F.2d 100, 103 (2d Cir.1986).
 
 
 65
 In the present case, though the syntax of the State statute differs from that of the federal Acts, it is possible that the State standard, as interpreted by the State, will not differ from the federal Acts in practical effect. For example, crediting the view of Womack that the State statute does not impose a performance standard and the representation of the Assistant Attorney General that a manufacturer may permissibly insert "zero" on the State-required label, one could conclude that the New York statute does not establish a minimum performance standard for bumpers. Thus, it is possible that, as applied by the State, the State standard will, as a practical matter, be identical to the federal standard. The precise meaning of the New York statute remains unclear. We conclude that it is appropriate for the district court to permit whatever factual development it sees fit in order to determine the contours of the New York statute and to make the determination as to whether that statute has been expressly preempted. If upon further disclosures by the State, it appears that no rational factfinder could fail to conclude that the State statute creates a bumper performance standard different from that created by the federal Acts, the district court should grant summary judgment in favor of plaintiffs.
 
 
 66
 Finally, though the district court opined that "[it] need not determine whether the New York Statute is impliedly preempted," 867 F.Supp. at 254, we note that there may well be some question as to whether the Cost Savings Act impliedly preempts the New York statute's requirement that bumper damage be tested. Though the district court held that the New York statute imposes only a disclosure requirement, the information that must be disclosed is not data for which the federal statute requires testing because bumpers are expressly excepted from the federal limitations on damage. Thus, the New York statute imposes a testing requirement that adds to the requirements of federal law and presumably will impose some cost on manufacturers in addition to the cost of complying with the federal regulation. Since (a) the goal of bumper regulation under the Cost Savings Act is to reduce consumer costs, (b) as discussed in Part II.B. below, the cost of testing may well be substantial, and (c) there can be little doubt that manufacturer costs will be passed on to the consumer, it is at least arguable that the testing of bumpers is either part of a field that Congress clearly intended to occupy, to the exclusion of the states, or that state requirements for testing of bumpers will so increase consumer costs as to constitute an obstacle to *612s 32502(d)'s goal of "obtain[ing] the maximum feasible reduction of costs to the public." These implied preemption questions remain open for exploration on remand.
 
 
 67
 B. Impermissible Burden on Interstate Commerce
 
 
 68
 With respect to AIA's Commerce Clause claim, we note preliminarily that the district court's analysis rested in large part on its view that the New York statute imposes no substantive performance requirement and that the commerce claim therefore suffered the "same infirmity" as the preemption claims. Since we conclude, as discussed above, that summary judgment dismissing the preemption claims was inappropriate, the summary dismissal of the Commerce Clause claims was, to that extent, likewise inappropriate.
 
 
 69
 We also note the existence of other questions of fact to be resolved with respect to AIA's contention that the New York bumper statute impermissibly burdens commerce. If state regulation, though not distinguishing between articles of commerce on the basis of their domestic or out-of-state origins, affects interstate commerce, the regulation will not be found to burden commerce impermissibly unless, on balance, the detriments to interstate commerce clearly outweigh the benefits to legitimate local public interests:
 
 
 70
 Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.... If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.
 
 
 71
 Pike v. Bruce Church, Inc., 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970); see also Lewis v. BT Investment Managers, Inc., 447 U.S. 27, 36-37, 100 S.Ct. 2009, 2015-16, 64 L.Ed.2d 702 (1980); Hughes v. Oklahoma, 441 U.S. 322, 331, 99 S.Ct. 1727, 1733-34, 60 L.Ed.2d 250 (1979).
 
 
 72
 In the present case, there are factual questions on both sides of the scales. The legislative history of the New York bumper statute indicates that the legislators sought to make available to consumers information that would allow them intelligently to compare vehicles with respect to safety, repair costs, and insurance costs. For example, one of the statute's sponsors stated:
 
 
 73
 Specifications regarding the strength of a vehicle bumper on impact can be a major criterion for many consumers who are safety conscious and would like to have this information available to them at the time of purchase.
 
 
 74
 (Memorandum in Support dated July 16, 1992, by Assemblyman Ivan C. Lafayette and Senator Serphin R. Maltese, at 1.) Similarly, the State Attorney General urged the Governor to approve the statute on the grounds, inter alia, that
 
 
 75
 a stronger bumper will reduce the likelihood that the car will require expensive repairs after a low speed collision. Thus, this bill could help to contain insurance costs, because the cost of repairs is factored into the determination of insurance premiums for property damage liability coverage. Consumers also commonly now agree to assume higher insurance deductible costs when accidents occur.
 
 
 76
 (Attorney General's Memorandum at 2.) The New York bumper statute itself requires that the label state that "[t]he stronger the bumper, the less likely the car will require repair after a low-speed collision." N.Y. Veh. & Traf. L. § 416-a(1).
 
 
 77
 Yet, the validity of the legislative assumptions that a stronger bumper will mean less damage and lower insurance premiums is debatable. For example, AIA submitted an affidavit from an automotive engineer stating that the notion that stronger bumpers will decrease costs is superficial because (a) stronger bumpers increase a car's weight, thereby generally increasing exhaust emissions and decreasing fuel economy, and (b) "some bumper impacts have resulted in unusually expensive repairs even though the bumper system itself was not damaged...." (Affidavit of Dean M. Bayer, Supervisor, Product Engineering Test Laboratories, Inland-Fisher Guide Division of General Motors Corporation, February 1, 1993 ("Bayer Aff."), p 22.)
 
 
 78
 Moreover, NHTSA itself has repeatedly considered implementing bumper-information disclosure requirements and has consistently declined to do so, finding that for consumers attempting to compare insurance and accident-repair costs, bumper-capability information is of little, if any, value. For example, a NHTSA study of insurance rate structures conducted from June 1974 through January 1976 produced the conclusion
 
 
 79
 that "... premium rates are not influenced to any great degree by vehicle damage susceptibility or safety characteristics. Although it may be economically logical that a degree of cost savings (via premium reduction) could be applied to those vehicles having superior characteristics, the current premium structure would minimize the effect of those vehicle related characteristics since premiums are primarily influenced by driver and geographical factors in addition to the price of the car."
 
 
 80
 55 Fed.Reg. 24,284, 24,287 (June 15, 1990) (NHTSA denial of petition for rulemaking (quoting Development of Vehicle Rating Systems for Automobile Consumer Information Study, General Electric Co., March 1976, DOT-45-4-00903)). NHTSA studies "between 1985 and 1987 to develop an effective consumer information program on the damageability of new car bumper systems, which would provide consumers with comparative bumper cost information related to vehicle purchasing decisions" similarly "failed to produce a consistent positive correlation between damage induced in laboratory bumper tests and insurance accident repair costs." Id. at 24,288. In 1990, NHTSA again considered imposing bumper information-disclosure requirements but elected not to do so, finding, inter alia, that new data confirmed its earlier conclusions that there is "not ... a consistent positive correlation between damage induced in laboratory bumper tests and insurance accident repair costs"; that "premium rates are not influenced to any great degree by vehicle damage susceptibility"; and that "specific components, such as bumpers, do not significantly affect the premium costs of auto insurance." Id. at 24,284. The NHTSA studies and the engineer's affidavit thus reveal substantial questions as to whether in fact significant benefits are created by the New York bumper statute.
 
 
 81
 There also are genuine issues as to the degree of the burden on manufacturers resulting from the required testing. AIA submitted affidavits from manufacturers to the effect that compliance with the statute annually would cost each major manufacturer hundreds of thousands of dollars. (See, e.g., Bayer Aff. pp 16, 20 (tests by General Motors to determine the speeds to be inserted in the labels would take more than 145 eight-hour shifts and cost more than $15,000 per model tested); Affidavit of Michael E. Klima, Design Analysis Manager, Toyota Motor Sales, U.S.A., Inc., February 2, 1993, at p 15 (for Toyota, labor expenses of at least $300,000, plus the cost of the test vehicles); Affidavit of Michael Love, Compliance Manager for Porsche Cars North America, Inc., February 2, 1993, at p 7 (for Porsche, at least $25,000 for each of four models).)
 
 
 82
 On the other hand, the State submitted an affidavit by the President of the Insurance Institute for Highway Safety stating that "[t]o minimize manufacturers' costs to comply with [the New York bumper statute] attributable to vehicle testing, the Institute is prepared to conduct such testing on vehicles supplied by the manufacturers ... at no cost to the manufacturers." (Affidavit of Brian O'Neill, July 23, 1993, at p 20.) Whether this would be a viable procedure and whether costs could thereby be significantly decreased is unclear. The resolution of that question is, on the present record, inappropriate for summary judgment.
 
 
 83
 Since there are genuine factual issues as to both the claimed burdens and the putative benefits created by the New York bumper statute, we remand for further development of the record in order to permit the district court to apply the Pike v. Bruce Church balancing test.
 
 C. Vagueness
 
 84
 We are not persuaded by AIA's contention that the New York bumper statute is impermissibly vague. The clarity of a statute that does not involve First Amendment freedoms is to be evaluated on an "as applied" basis. See, e.g., United States v. Powell, 423 U.S. 87, 92, 96 S.Ct. 316, 319-20, 46 L.Ed.2d 228 (1975); United States v. National Dairy Products Corp., 372 U.S. 29, 33, 83 S.Ct. 594, 598, 9 L.Ed.2d 561 (1963); United States v. Whittaker, 999 F.2d 38, 42 (2d Cir.1993). A civil statute is not impermissible under this standard unless its commands are "so vague and indefinite as really to be no rule or standard at all." Boutilier v. INS, 387 U.S. 118, 123, 87 S.Ct. 1563, 1566, 18 L.Ed.2d 661 (1967) (internal quotation marks omitted). The degree of vagueness permitted varies with the nature of the enactment and the correlative needs for notice and protection from unequal enforcement. See, e.g., Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 498-99, 102 S.Ct. 1186, 1193-94, 71 L.Ed.2d 362 (1982); Textile Workers Pension Fund v. Standard Dye & Finishing Co., 725 F.2d 843, 855 (2d Cir.), cert. denied, 467 U.S. 1259, 104 S.Ct. 3554, 82 L.Ed.2d 856 (1984).
 
 
 85
 In the context of commercial regulation, "courts have consistently upheld the use of phrases which on their face are not particularly descriptive" such as "so far as practicable, and, where feasible," "fair and open competition," "shortest practicable route," "other due and sufficient cause," "near proximity," and "unreasonably low prices." Id. at 855-56 (internal quotation marks omitted). "[B]usinesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action. Indeed, the regulated enterprise may have the ability to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process." Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. at 498, 102 S.Ct. at 1193 (footnote omitted).
 
 
 86
 AIA contends that the New York bumper statute is impermissibly vague (1) because it does not specify the speed increments at which testing must be conducted to determine "maximum speed of impact," and (2) because it does not define the terms "safety systems" in § 2 and "common repair materials" in § 1. As discussed in Parts II.A. and II.B. above, the contours of the maximum-speed requirement remain to be explored on remand in connection with consideration of AIA's preemption and Commerce Clause claims and need not be separately addressed here. As to the terms "safety systems" and "common repair materials," we cannot conclude that they are void as applied for the statute was not enforced while the litigation was pending in the district court and there is no evidence as to these terms as applied. Nor is it apparent that they will not be construed by the State in a way that permits compliance and even-handed enforcement. For example, the State has taken the position that the term "safety systems" in § 2 of the New York statute refers only to automotive features set out in the federal standards. And we agree with the district court that automobile manufacturers should be able to fathom the meaning of "common repair materials" in the context of automobile repairs. Though it is possible that future events may raise constitutional problems as to the meaning of the statute, any such problems may be considered if and when they arise.
 
 CONCLUSION
 
 87
 For the foregoing reasons, the judgment of the district court is vacated and the case is remanded for further proceedings not inconsistent with this opinion.